In re Tina Marie STONE, a/k/a Tina Marie Churilla, Debtor.

Tina Marie STONE, a/k/a Tina Marie Churilla, Movant,

v.

Robert W. KASUBA, Respondent.

Bankruptcy No. 93–22358–BM.
Motion No. 93–1889M.

United States Bankruptcy Court, W.D. Pennsylvania.

April 20, 1994.

Joseph M. Fornari, Jr., Pittsburgh, PA, U.S. Trustee.

Robert W. Kasuba, pro se.

Donald R. Calaiaro, Calaiaro & Corbett, P.C., Pittsburgh, PA, for debtor/movant.

Phillip M. Irani, Pittsburgh, PA.

Robert E. Colville, Dist. Atty., Allegheny County, Pittsburgh, PA, for Allegheny County.

Gary L. Smith, Pittsburgh, PA, Trustee.

## *MEMORANDUM OPINION*

BERNARD MARKOVITZ, Bankruptcy Judge.

Debtor Tina Marie Stone ("Stone") has brought a motion (at Motion No. 93–1889M) to hold Robert Kasuba ("Kasuba") in contempt for disobeying an order issued on March 5, 1993 which, among other things, enjoined him from the unauthorized practice of law in this court in the future. Stone asserts that Kasuba disobeyed the order in offering legal advice and by preparing the bankruptcy petition she filed in this court in July of 1993.

Kasuba insists that he has not disobeyed the order.

In accordance with the analysis set forth below, the court finds that Kasuba is in contempt for disobeying the order of March 5, 1993. As a sanction for his misconduct, Kasuba will be directed to provide the United States trustee with a certified list of *all* bankruptcy petitions he has prepared and to specify the amounts he personally received for preparing each petition. A judgment shall be entered against Kasuba in the above sum to and for the benefit of said bankruptcy petitioners, who may exercise their remedies jointly or severally in any court having jurisdiction.

We recognize that this sanction, aside from its breadth, is not dissimilar from the sanction issued on March 5, 1993. We have declined to take more draconian measures with the firm conviction that respondent shall strictly comply. If he does not, other sanctions will be considered.

—I—

## FACTS

The following order was entered on March 5, 1993:

AND NOW at Pittsburgh this 5th day of March, 1993, in accordance with the accompanying Memorandum Opinion, it hereby is **ORDERED, ADJUDGED** and **DECREED** that Robert Kasuba, d/b/a Affordable Legal Assistance, is enjoined from the unauthorized practice of law and is **ORDERED** to cease and desist from preparing in the manner described in the Memorandum Opinion any more bankruptcy petitions or other documents for filing in this court.

IT FURTHER IS **ORDERED, ADJUDGED** and **DECREED** that Robert Kasuba, doing business as Affordable Legal Assistance, provide to the United States Trustee within thirty (30) days of this order a certified list of all petitions and other documents prepared by him for filing in this court and of the fees collected by him for services rendered in those cases.

IT FURTHER IS **ORDERED, ADJUDGED** and **DECREED** that Robert Kasuba, doing business as Affordable Legal Assistance, disgorge the fees collected by him in the above captioned bankruptcy cases and return them to debtors within thirty (30) days of this order.

No appeal was taken of this order.

The surrounding facts and analysis leading to entry of the order are set forth in *In re Harris,* 152 B.R. 440 (Bankr.W.D.Pa.1993), and shall not be recounted at this time.

Kasuba is not an attorney and is not authorized to practice law in the Commonwealth of Pennsylvania or in any other jurisdiction.

On April 3, 1993, approximately one (1) month after the above order had been issued, Kasuba met with attorney Phillip M. Irani, Esq., and proposed a working relationship with him. Kasuba told Irani, who is authorized to practice law in Pennsylvania, that he was a paralegal who knew how to prepare bankruptcy petitions and schedules. Although Kasuba told Irani that he was "having trouble with the United States trustee", he did not advise him about the March 5, 1993 order.

Shortly after their meeting, Kasuba and Irani entered into a business relationship. It was agreed that Kasuba would meet with prospective debtors and would prepare the relevant bankruptcy documents. Kasuba was to inform them that he was Irani's "legal assistant" and was not to offer legal advice.

Once Kasuba had completed the paperwork, Irani was to review it to ensure that it

had been properly prepared. The client then made payment to Irani for services rendered. Kasuba, it was agreed, would receive $100.00 for each petition he prepared.

Prospective clients did not meet with Irani at any time prior to the filing of the bankruptcy petitions. Kasuba and Irani maintained separate places of business several miles apart.

Kasuba apparently ceased doing business as Affordable Legal Services at or about the time that he and Irani entered into their business relationship.

In late-March of 1993, several weeks after the above order had been issued, Stone responded to an advertisement Kasuba had placed in a local newspaper and met with Kasuba at his place of business. Kasuba informed Stone that he previously had "practiced" in California and said that he had a relationship with an unidentified attorney whom he described as his "partner". He did not, however, inform Stone that he was not an attorney authorized to practice law in the Commonwealth of Pennsylvania. To the contrary, Stone came away from that meeting with the definite impression that Kasuba was an attorney lawfully practicing and having a familiarity or expertise in the area of bankruptcy law.

Stone and Kasuba met again several more times during the ensuing weeks. At those meetings, the two exchanged questions and answers and Kasuba advised her about various bankruptcy matters.

For instance, Kasuba inquired about her debts and incorrectly advised her that she should not list all of her creditors on the bankruptcy schedules. In particular, Kasuba advised Stone not to list a creditor to whom she owed a school loan. According to Kasuba, Stone would not be able to get a loan in the future from that creditor if she listed it.

Kasuba also explained the significance of exemptions to Stone and advised her as to what exemptions to take. He told Stone, for instance, that she could keep her automobile if she claimed it as exempt.

Stone also had been having problems with her landlord, who sought to evict her for failing to pay rent. Kasuba incorrectly explained the significance of the automatic stay to Stone and advised that it would protect her from eviction. He also told Stone that the chapter 7 trustee "would deal with her landlord" and that she need not worry about it.

Kasuba subsequently prepared a voluntary chapter 7 bankruptcy petition and schedules for Stone based upon the information she had provided. Stone returned to Kasuba's place of business at the beginning of July of 1993 and signed the documents in places Kasuba had indicated. She also made a check payable to Irani in the amount of $135.00. As has been indicated, Kasuba was to receive $100.00 of this amount pursuant to the agreement with Irani.

On July 2, 1993, Stone filed a *pro se* voluntary chapter 7 petition at Bankruptcy No. 93–22358–BM.

On Schedule C, Exemptions, Stone claimed an exemption in her automobile pursuant to 11 U.S.C. § 522(d)(2). She also claimed exemptions in her checking account, household goods, clothing and jewelry, a firearm, a tax return, and in her public assistance benefits. PNC Education Loan Center, the creditor to whom Stone owed a debt for an unpaid school loan, was not listed as a creditor on the bankruptcy schedules.

Kasuba and Irani terminated their business relationship in August of 1993, when Irani learned of this court's order issued on March 5, 1993. During the time that he had worked with Irani, Kasuba had prepared approximately thirty (30) bankruptcy petitions. In each and every one, Kasuba offered advice as to the status of the law for a specified consideration. Subsequent to the termination of his relationship with Irani, Kasuba became employed by Terminix as a sales representative/inspector.

As previously stated, much of the advice Kasuba had given to Stone was "faulty". After notice and hearing, an order was entered on October 12, 1993 granting Stone's landlord relief from stay. Also, the chapter 7 trustee advised Stone that she would have to list *all* of her creditors on her schedules. Accordingly, on November 8, 1993, Stone submitted an amended Schedule F which list-

ed PNC Education Loan Center as a creditor with an unsecured claim of approximately $3,000.00.

Stone is not the only presently identified individual for whom Kasuba is known to have prepared a bankruptcy petition subsequent to March 5, 1993.

Mary Trainer ("Trainer") saw an advertisement Kasuba had placed in a local newspaper in May of 1993 and shortly thereafter met with Kasuba at his place of business to discuss the advisability of filing a bankruptcy petition. During this meeting, Kasuba advised Trainer that she need not list on her bankruptcy schedules a valuable pending personal injury lawsuit in which she was a plaintiff.

Utilizing information he had gotten from Trainer during the meeting, Kasuba subsequently prepared a voluntary chapter 7 bankruptcy petition for Trainer. She received the documents in the mail and signed them in the places indicated by Kasuba.

Trainer made a check payable to Irani in the amount of $150.00 for the services rendered by Kasuba. Pursuant to his agreement with Irani, Kasuba received $100.00 of that amount.

On May 24, 1993, Trainer filed a *pro se* voluntary chapter 7 petition at Bankruptcy No. 93–21857–JKF. At no time prior to the filing of the bankruptcy petition had Trainer met with Irani. The pending personal injury lawsuit was not listed on the bankruptcy schedules as an asset of the estate.

On October 12, 1993, after the chapter 7 trustee had informed Trainer that she was required to list the lawsuit as an estate asset, Trainer filed amended schedules in which she listed the lawsuit and valued it at $90,000.00 and claimed various exemptions therein.

At the request of Trainer, an order was issued on February 17, 1994 dismissing the bankruptcy petition and declaring that she remained liable for all her debts as though the petition had not been filed.

On October 15, 1993, Stone brought a motion (at Motion No. 93–1889M) to hold Kasuba in contempt and for unspecified sanctions. Stone asserts that Kasuba disobeyed the order of March 5, 1993 in that he engaged in the unauthorized practice of law in the preparation of her bankruptcy petition and schedules.

A hearing on Stone's motion initially was scheduled for November 16, 1993. Stone's counsel certified to the court on November 15, 1993 that he had attempted, without success on various occasions, to serve Kasuba at his last known address with notice of the hearing on the motion.[1] An order subsequently was issued directing the United States Marshal to locate and to take Kasuba into custody.

An evidentiary hearing was held on Stone's motion on March 23, 1994, after Kasuba had been apprehended and all parties had been given an opportunity to prepare for the proceeding. Stone, Kasuba, and the United States trustee participated in the hearing and were given an opportunity to offer evidence. Kasuba elected to represent himself after the court informed him of the potential hazards of so doing.

—II—

## DISCUSSION

Two major issues must be resolved at this time:

(1) whether Kasuba's above-described conduct constitutes contempt of this court; and

(2) if it does, what sanction would be appropriate in this instance.

### A. *Is Kasuba In Contempt?*

■ A bankruptcy court has authority pursuant to 11 U.S.C. § 105(a) to hold a person in civil contempt. *See In re Stephen Grosse, P.C.,* 84 B.R. 377, 385–86 (Bankr. E.D.Pa.1988), *affirmed,* 96 B.R. 29 (E.D.Pa. 1989), *affirmed, Dubin v. Jakobowski,* 879

---

1. Although Stone had filed her bankruptcy petition *pro se,* Donald R. Calaiaro, Esq., entered his appearance on her behalf on October 1, 1993.

F.2d 856 (3d Cir.1989), *cert. denied,* 493 U.S. 976, 110 S.Ct. 501, 107 L.Ed.2d 504 (1989).

■ In order for a person to be in civil contempt, a court must determine that:

(1) they violated a specific and definite court order; and

(2) they had knowledge of the order which was sufficient to put them on notice of the proscribed conduct.

*In re Grosse,* 84 B.R. at 383; *also U.S. v. Christie Industries, Inc.,* 465 F.2d 1002, 1006 (3d Cir.1972); *In re Rubin,* 378 F.2d 104, 108 (3d Cir.1967). The notice must give "fair warning that certain acts are forbidden; any ambiguity in the law should be resolved in favor of the party charged with contempt". *U.S. on Behalf of IRS v. Norton,* 717 F.2d 767, 774 (3d Cir.1983).

### i) *Did Kasuba Violate The Order Of March 5, 1993?*

As has been noted, the order of March 5, 1993 expressly enjoined Kasuba from "the unauthorized practice of law" and directed him to "cease and desist from preparing ... any more bankruptcy petitions or other documents in this court".

■ State law must be considered when determining whether one has engaged in the unauthorized practice of law in a bankruptcy court. *In re Bachmann,* 113 B.R. 769, 772 (Bankr.S.D.Fla.1990); *In re Preston,* 82 B.R. 28, 30 (Bankr.W.D.Va.1987); *Matter of Arthur,* 15 B.R. 541, 544–45 (Bankr.E.D.Pa. 1981).

■ Pennsylvania law, which applies here, provides as follows:

Any person who within this Commonwealth shall practice law, or who shall hold himself out to the public as being entitled to practice law, or use or advertise the title of lawyer, attorney at law, attorney and counselor at law, counselor, or the equivalent in any language, in such a manner as to convey the impression that he is a practitioner of the law of any jurisdiction, without being an attorney at law or a corporation complying with 15 Pa.C.S. Ch. 29 (re-

lating to professional corporations), commits a misdemeanor of the third degree.

42 Pa.C.S.A. § 2524 (Purdon's Supp.1993).

The purpose of such legislation:

... is not to secure to lawyers a monopoly, however deserved, but, by preventing the intrusion of inexpert and unlearned persons in the practice of law, to assure to the public adequate protection in the pursuit of justice, than which society knows no loftier aim.

*Shortz v. Farrell,* 327 Pa. 81, 91, 193 A. 20, 24 (1937). *See also Childs v. Smeltzer,* 315 Pa. 9, 171 A. 883 (1934). In short, the statute is designed to protect and secure the public's interest in competent legal representation. *Matter of Arthur,* 15 B.R. at 544.

It is not possible to define with precision what activities constitute "practicing law". Such an endeavor is "more likely to invite criticism than to achieve clarity". *Shortz,* 327 Pa. at 84, 193 A. at 21.

■ The focus when making a determination is upon whether the activity in question involves the "exercise of legal judgment". *Dauphin County Bar Ass'n v. Mazzacaro,* 465 Pa. 545, 553, 351 A.2d 229, 233 (1976). One practices law when they perform actions which require legal knowledge, training, skill, and ability beyond what the typical layperson possesses. *Matter of Arthur,* 15 B.R. at 546.

■ Kasuba practiced law in connection with his preparing of the bankruptcy petitions and schedules for Stone and Trainer. The Memorandum Opinion and Order of Court of March 5, 1993 set forth in detail the activities prohibited. His "arrangement" with Irani did not shield him from the order of March 5, 1993.

As has been indicated, Kasuba advised Stone that she should not list one of her creditors. He also advised Stone as to what exemptions to claim and that the automatic stay would prevent her landlord from having her evicted. In addition, Kasuba advised Trainer that she need not list a pending personal injury lawsuit in which she was a plaintiff because she might not win a money judgment.

Such activities involved the exercise of legal judgment. The advice he gave to Stone and Trainer and the decisions Kasuba unilaterally made when preparing their bankruptcy petitions and schedules unquestionably required legal knowledge, training, skill, and ability beyond what the typical layperson possesses. The skills required were certainly beyond those possessed by Kasuba.

The fact that Irani supposedly reviewed the documents after Kasuba had prepared them does not alter this conclusion. Irani merely checked the documents for glaring mistakes and had no way of knowing what legal advice Kasuba had given and whether that advice was proper.

As has been noted, Kasuba prepared approximately thirty (30) bankruptcy petitions during the course of his business relationship with Irani. It is reasonable to infer that Kasuba provided services in each and every case similar to those he provided for Stone and Trainer and that, in so doing, he engaged in the unauthorized practice of law in each and every instance.

### ii) *Did Kasuba Understand What Activities Were Proscribed?*

Not only did Kasuba continue to engage in the practice of law subsequent to the order of March 5, 1993, he undoubtedly also understood what types of conduct were proscribed by the order.

Kasuba conceded at the hearing on March 23, 1994 that he had received the order of March 5, 1993 and the accompanying memorandum opinion, which explained in clear and simple language that certain activities in which he had engaged constituted "practicing law" and were illegal.

The court has had several opportunities to observe Kasuba and is confident that Kasuba clearly understood the order and the kinds of activities he was enjoined from pursuing in the future. Kasuba's conduct after the order had been issued reinforces this inference.

Instead of ceasing and desisting altogether, Kasuba continued, under the guise of a business relationship with an attorney, doing what he previously had done. Kasuba did not, however, inform Irani of the order of March 5, 1993 because he recognized that Irani would not consent to the arrangement if Kasuba told him.

Kasuba was well aware that his "arrangement" with Irani would not legitimize his activities but hoped nonetheless that it would enable him to continue doing covertly what he no longer dared to do overtly. Kasuba induced Irani to lend his name to Kasuba's undertaking in order to bestow the appearance of legitimacy upon activities Kasuba knew to be in violation of the order.

### B. *What Would Be An Appropriate Sanction?*

■ An appropriate sanction must be levied now that it has been determined that Kasuba is in contempt. Neither Stone nor the United States trustee has been helpful in this regard. The penal laws of the Commonwealth of Pennsylvania provide a criminal sanction to a layman engaging in the unauthorized practice of law. Unfortunately, this sanction is unavailable to this court and the appropriate law enforcement officials have not to date acted.

■ Contempt may be either criminal or civil, depending on the purpose and character of the sanctions imposed against the contemnor. *Latrobe Steel Co. v. United Steelworkers*, 545 F.2d 1336, 1343 (3d Cir. 1976). Civil contempt sanctions are meant to coerce or to compensate; criminal contempt sanctions to punish. *See In re Grand Jury Proceedings Harrisburg Grand Jury*, 658 F.2d 211, 217 (3d Cir.1981).

■ The sanctions available to a court in response to civil contempt are many and varied. It may award compensatory damages to the aggrieved party or may impose a fine or damages to enforce compliance. *See McDonald's Corp. v. Victory Investments*, 727 F.2d 82, 87 (3d Cir.1984). The court may even impose an indeterminate period of incarceration, which can be brought to an end only by the contemnor's ultimate adherence to its orders. *Latrobe Steel*, 545 F.2d at 1344.

The court's overriding concern, both when it issued the order of March 5, 1993 and now that it has determined that Kasuba is in

contempt, is that Kasuba cease and desist from practicing law in this court in the future. Accordingly, an appropriate sanction in this instance would be one that coerces him into obeying that order.

Kasuba prepared bankruptcy petitions for approximately thirty (30) individuals, only two of whom have been identified, during his "arrangement" with Irani. In addition, Kasuba admitted previously that he had prepared approximately seventy (70) bankruptcy petitions prior to the entry of the order of March 5, 1993. Furthermore, the court has been advised that Kasuba has not complied with the provisions of the order of March 5, 1993 requiring him to provide the United States trustee a list of all petitions he prepared prior to that time and of the fees collected by him for those services and to return the fees to the individuals who paid them.

As a sanction for his contempt, Kasuba will be directed to provide to the United States trustee within thirty (30) days a certified list of all bankruptcy petitions he has prepared, both prior to and subsequent to March 5, 1993, and to indicate the specific amounts he personally received for each petition. In addition, a judgment shall be entered in said sum to and for the benefit of the petitioners.

The court recognizes that the total amount might be substantial and that Kasuba might not be able to disgorge the full amount at this time. Accordingly, Kasuba will be directed to work out a payment schedule which is acceptable to the United States trustee and which will enable him to repay the total amount in full within a reasonable period of time.

The court has sought to impose the minimum sanction which it believes will coerce Kasuba into complying with the order of March 5, 1993. Continued contumacy on Kasuba's part, however, could result in imposition of draconian additional sanctions, including a substantial *in terrorem* fine and/or incarceration.

An appropriate order shall be entered.

### ORDER OF COURT

AND NOW at Pittsburgh this 20th day of April, 1994, in accordance with the accompanying Memorandum Opinion, it hereby is **ORDERED, ADJUDGED** and **DECREED** as follows:

(1) Robert Kasuba shall provide to the United States trustee within thirty (30) days of the date of this order a certified list of *all* bankruptcy petitions that he has ever prepared on behalf of others, including petitions prepared prior to and subsequent to March 5, 1993. Said list shall also indicate the amounts paid to Kasuba for each of the petitions. Thereafter a judgment shall be and is entered in said sum to and for the benefit of said petitioners.

(2) Robert Kasuba shall at that time disgorge the total amount he has received to the United States trustee, who then shall return these amounts to the individuals who paid Kasuba.

(3) In the event that Kasuba is unable to disgorge the entire amount at that time, he shall work out a payment schedule which is acceptable to the United States trustee and which will repay the total amount in full within a reasonable time.

IT IS SO **ORDERED.**