**In re HESSINGER & ASSOCIATES, Attorneys.**

**Misc. No. 94–102.**

United States Bankruptcy Court, N.D. California.

Aug. 9, 1994.

Memorandum of Decision

ALAN JAROSLOVSKY, Bankruptcy Judge.

I. Introduction

Hessinger & Associates is supposedly a law firm. It is in fact an interstate business controlled nationally by Earl Cook and locally by David Hansen, neither of whom are lawyers. Joseph Hessinger is supposedly the owner of the firm. He is in fact the front man for Cook and Hansen.

The business practices of Hessinger & Associates have included gross violations of the California State Bar Rules of Professional Conduct. Hessinger is personally responsi-

ble for these violations, as well as allowing Cook and Hansen to control the firm and sharing his fees with them. Because Hessinger is not a member of the State Bar of California, the sorry task of exposing the scheme he calls a law practice and enforcing the Rules of Professional Conduct falls upon the court.[1]

Even with the participation of the U.S. Trustee, the task of investigating this matter has not been an easy one. The court has the responsibility for enforcing the rules, but has no staff to rely upon nor the time to devote to the exhaustive process of exposing an illegal enterprise. Were it not for the former employees of Hessinger who have come forward with testimony revealing the extent of Hessinger's wrongdoing, the court would have been powerless to act.[2] Thanks to this information, however, the court is able to paint an accurate picture of the way Hessinger & Associates has been run and has an extensive record upon which to base its findings.

The evidence has revealed an incredibly ugly and evil enterprise. In the guise of being a law firm, Hessinger & Associates is able to lure debtors into its offices with the sole intent of extracting as much money as possible from them with no concern whatsoever about counseling them. In addition to allowing nonlawyers to run "his" practice and sharing his fees with them, Hessinger has completely abdicated his responsibilities as a lawyer to act ethically and responsibly. As outlined below, he must be sanctioned severely for his conduct.[3]

## II. Background

Hessinger & Associates started out as Varbel & Associates, run by Earl Cook and Duane Varbel, an Arizona lawyer. The firm started in Arizona, and then expanded into southern and northern California as well as other areas. Its mode of operation was to advertise very heavily, with high-profile radio and television advertising as well as late-night "infomercials" touting the instant relief from debt problems and how bankruptcy was a "constitutional right" which every citizen should use to get out of debt. The advertising made heavy use of actors portraying harassed and troubled debtors.

Varbel & Associates hired a few young and inexperienced lawyers, but most of its work was performed by "paralegals" with little or no formal training. Within the firm, they were called "credit specialists." Their job was to lure the debtor into their offices, get them to sign a contract promising to pay the fee, then preparing and filing the bankruptcy papers. In the majority of cases, the debtor had no contact with a lawyer at all until the 341 meeting, when a Hessinger lawyer they had never met was present.

Varbel's main selling point, as well as its means of funneling funds to its nonlawyer principals, was to offer its services for no

---

1. Local Rule 110–6 makes all attorneys who practice in this court subject to the Rules of Professional Conduct of the State Bar of California, regardless of whether they are members of that bar. Local Rule 110–7 provides that any judge in the district may take appropriate disciplinary action against any attorney. Pursuant to 110–6, disbarment proceedings must be held before a district judge other than the judge initiating the proceedings.

2. Although there has been considerable discussion as to changing them, the current local rules permit a lawyer to set up permanent shop in this district even though he or she is not a member of the California bar. This rule works a deception on the public, which naturally assumes that any attorney openly advertising for business must have passed the rigorous California bar exam. The rule also make the least qualified and ethical lawyers in the district immune from investigation by the State Bar of California, which has steadily improved its disciplinary system over the last several years.

The court is poorly equipped to do the extensive investigation necessary to police the bar. This process has been unbelievably exhaustive to the court; it is little wonder that nothing has been done about Hessinger to date. The court greatly appreciates the work of the U.S. Trustee in this matter; it cannot have been easy for her office either.

3. Several times during his testimony before the court, Hessinger admitted to many of the abuses discussed here but argued that they have been changed and corrected. In dealing with violations of ethical rules, it counts for nothing that, once exposed, a lawyer changes his practices. Lawyers are not entitled to one free bite.

Moreover, the changes cited by Hessinger are cosmetic and without substance. He continues to be Earl Cook's stooge in an illegal enterprise.

money down. The debtor was asked to sign a promissory note for the fees, to be paid after bankruptcy. The fees were typically set at three times the amount normally charged by lawyers for doing those types of consumer cases.

After bankruptcy, the notes were transferred to numerous "finance companies" set up by Cook. Some of these companies were owned by Cook himself, or by his relatives, some by Varbel, and at least one by Hessinger. These finance companies collected the fees from the debtors. If the debtors did not pay, they were dunned and sued by the finance companies.

In early 1993, Varbel was disbarred and, in his own words, Hessinger "took over" the practice. In reality, he became the figurehead for the firm, which continued doing business in the same way as before. The firm continued to be run overall by Cook and locally by Hansen, who made all the hiring and firing decisions and exercised complete control over the day-to-day operations of the business, including the conduct of the few lawyers employed by the firm.

Hessinger first came to the attention of this court when the U.S. Trustee objected to his fees in two Chapter 7 cases, which were two or three times as high as other attorneys were charging. Further investigation revealed that all of the work in the cases had been done by nonlawyers and without supervision, and that Hessinger was selling the fee contracts to finance companies for enforcement after bankruptcy even though the promissory notes were executed before bankruptcy and clearly had been discharged.[4] It became clear to the court that more was involved here than simple overcharging, and that ethical issues must be addressed.

## III. Lay Control

■ Hessinger & Associates is nothing more than a get-rich-quick scheme of Earl Cook. Aided by a venal and morally bankrupt lawyer, Duane Varbel, Cook set up a business to sell bankruptcies to the public and reap the rewards. Upon Varbel's dis-barment, Hessinger stepped in to become the front man for the enterprise.

Hessinger maintained that he was in charge of the firm, but the evidence is absolutely overwhelming that he exercised no actual control whatsoever and that all decisions regarding all phases of the operation are made by nonlawyers.

The court was very strongly affected by the testimony of Stephanie Morris, a young lawyer in need of a job who worked for Hessinger & Associates for several months. She was hired by Cook and met Hessinger only once, at a dinner party. She was expressly told by Cook that she was to take directions from only him and his local managers, Turan Kahraman in southern California and Gary Hansen in northern California, neither of whom were lawyers. She was directly and expressly told by Cook that she was not to contact Hessinger for any reason.

Morris was under the direct supervision of Kahraman and Hansen. On several occasions she had arguments with them over her conduct as a lawyer. They complained to her that her "sales" were considerably less than those of the paralegals who were performing the same duties as her. When she explained that she could not ethically file a bankruptcy for someone who did not need it, they told her that the firm's policy was to sign up every person who came in for an interview. They expected her to use the standard interview, called the "six-minute sell," whereby every debtor who came in was expected to be talked into signing the Hessinger fee agreement within six minutes of walking in the door.

Morris also was subject to rebuke by Kahraman and Hansen for refusing to quote every debtor a fee of $1,500.00. They told her that it was the firm's policy to charge every debtor this amount. Morris refused, on grounds that in many cases this amount was unconscionable.

The declaration of Jody L. Downey tells an almost identical story. She worked for Hes-

---

**4.** This practice has been the subject of separate proceedings. See *In re Hessinger,* 165 B.R. 657

(Bkrtcy.N.D.Cal.1994).

singer & Associates as a lawyer from June to September, 1993. During that time it was Cook, not Hessinger, who directed her. As she reported in a letter to the State Bar:

> Although I do not know what capacity Mr. Cooke worked in, or what position he held it was understood and common knowledge that Cooke was an "investor." Mr. Cooke was clearly in charge of this operation and he was the individual who set the fee structure.

She went on to describe a confrontation just like Morris:

> I refused to sign petitions in which the debt ratio was too low to substantiate at $1,500.00 fee. On several occasions I refused to sign petitions. I had several heated discussions with Mr. Cooke over this and in the end I was basically told that if I refused to sign the petitions I could find employment elsewhere, which is what I did.

Like Morris, Downey was under pressure to sign up every single person who came to see her.

Another former Hessinger lawyer, Rebekah M. Sutin, reported the same practices in family law cases:

> Mr. Cooke was clearly in charge and stated there would be no changes to the fee agreement. Like Jody Downey, I was directed by Earl Cooke as to how much to charge my clients. All the offices had received by fax from Mr. Cooke a chart telling us how much to charge family law clients which ranged from $1500–$6500 depending entirely on their incomes and assets with no regard for the work that needed to be done.

The declaration of Walter H. Morehouse tells a similar story. Employed for three weeks in April, 1994, after an interview with Cook and Kahraman, he described their operations:

> Since there were no bankruptcy lawyers in the Olympic [southern California] office, the debtor clients were interviewed by non-lawyer Hessinger employees. All bankruptcy petitions in that office were prepared by Larry Dummerville, another lay employee who also interviewed and counseled debtor clients concerning their rights under bankruptcy law. After a good number of bankruptcy petitions had accumulated, they were picked up by a courier and carried to some other office to be signed and filed.

Morehouse was fired by Kahraman after he refused to sign bankruptcy petitions *en masse* for people whom he had never met.

Jennifer Kung was a Hessinger lawyer from March to May, 1994, when she quit because of Hessinger's practices. In her declaration, she reported experiences identical to the other former Hessinger lawyers:

> I was very uncomfortable with the oversight by the two non-attorney managers, Gary Hansen and Earl Cook. Both were critical of me when I did not sign up clients who had accepted my counseling in deciding bankruptcy was not in their best interests. In May, 1994, just before I left Hessinger, Mr. Cook scolded me over the phone for not signing up several people on that particular day.

Despite Hessinger's lame representation that all the decisions were his, it is clear that all of the decisions were made by Cook and his nonlawyer deputies. All of the attorneys (including Bruce Kerr and Joseph Johnson, two currently employed attorneys) state that they were hired by Cook or Hansen or Kahraman without ever having seen Hessinger. When Kerr wanted a raise in pay, he asked Cook, not Hessinger. In a declaration filed to discredit Morehouse, Gloria Juarez noted that he was fired by Kahraman (our Administrator), not Hessinger. Morris' termination was the same. Hessinger presides over a "law firm" in which all the hiring, firing, and supervision of lawyers is done by nonlawyers who also set the fees.

No lawyer may ethically practice law under the direction of a nonlawyer. To do so violates Rule 1–600 of the California Rules of Professional Conduct, which forbids a lawyer to participate in any organization which allows any third person to interfere with the lawyer's independence or professional judgment or allows an unlicensed person to practice law. The reason for such a rule is to "prevent business relationships with non-lawyers from compromising a lawyer's indepen-

dence of thought and action." G. Hazard, 2 *The Law of Lawyering* (2d Ed.1990), 5.4:502.

By lending his name and license to an organization run by a layman, Hessinger has committed the grossest of ethical violations. He has allowed Cook to set up a system whereby nonlawyers supervise and direct lawyers and coerce them to do something not in their clients' best interests. This conduct is reprehensible beyond words. To anyone who has any degree of love for the law, it is physically revolting.

## IV. Fee Sharing

█ The accounting of how much Cook is reaping from this operation is beyond the court's ability to investigate. However, the mechanics of it are fairly clear. First, Cook is paid a salary of $4,000.00 per month. Second, Cook is the owner of the advertising company which produces Hessinger's commercials. Third, Cook owns part or all of several of the finance companies to whom notes from clients are assigned for collection. Between all of these sources of revenue, Cook's income from Hessinger operations far outstrips that of Hessinger.

Rule 1–320 of the California Rules of Professional Conduct provides that a lawyer or law firm may not directly or indirectly share legal fees with a person who is not a lawyer. Rule 1–600 contains a similar ban. Hessinger's financial arrangements with Cook are clearly intended to circumvent these rules, and are not in any way legitimate exceptions to the rules. There is no legitimate employer-employee relationship between Hessinger and Cook. It is that latter who is the employee. The court accordingly finds a gross violation of Rule 1–320 and Rule 1–600.

## V. Failure to Act Competently

█ Rule 3–110(A) of the California Rules of Professional Conduct provides that a member shall not intentionally, recklessly, or repeatedly fail to perform legal services with competence. Hessinger has violated this rule in hundreds of cases, if not thousands.

First and foremost, the policies set by Cook and enforced by Hansen and Kahraman were designed to maximize their income, not properly counsel clients as to whether or not they should file a bankruptcy petition. Within Hessinger, petition filings are referred to as "sales." All Hessinger employees who interviewed clients, whether attorneys or nonlawyer "credit specialists", were given specific and repeated directives to sign to a fee contract every person who came in the door within six minutes. Called the "six-minute sell," it was the official policy of Hessinger to sell every person who responded to one of their ads on filing a bankruptcy within six minutes of the start of the interview. Those attorneys who knew better and balked were criticized and let go. Nonlawyers, in addition to not having the training needed to evaluate if a bankruptcy was appropriate, had no ethical considerations to worry about.

Additionally, Hessinger regularly offered special bonuses, in the form of cash or trips, to attorneys or credit specialists who filed the most bankruptcy petitions. Hessinger's argument that these were only to "reduce the backlog" is nonsense; the bonuses were simply to encourage Hessinger employees talk every single person whom they interviewed into filing a bankruptcy petition. The former Hessinger attorneys who have come forth have confirmed that this was the official policy of the firm.

Counseling is the fundamental function performed by consumer lawyers. By placing its interest in revenue ahead of its obligation to counsel its clients, Hessinger & Associates has acted recklessly and incompetently and has violated Rule 3–110(A). By failing to stop the practice and insure that each and every person who came into one of his offices received proper counseling, Joseph Hessinger has personally violated the rule.

Additionally, Hessinger has violated the rule by allowing nonlawyer employees, many with little or no legal training, to interview clients and prepare their bankruptcy papers without any significant (and in hundreds of cases not even insignificant) supervision by a lawyer.

## VI. Aiding in the Unauthorized Practice of Law

█ The way Cook has structured the Hessinger procedures, potential clients are

directed to one person who interviews them, gets them to sign the fee agreement, and prepares the bankruptcy papers. Although a small number of young an inexperienced lawyers are used (mainly to sign the petitions and Rule 2016 statements), most of the cases are handled by nonlawyer "credit specialists" who are not under the supervision of a lawyer, are given bonuses based on the number of cases they file, and are directed as to policy by Cook and as to day-to-day activities by Hansen and Kahraman.

The procedure Hessinger used has been described by Terrie Nickles, who worked as a paralegal and credit specialist for Hessinger from February to December, 1993:

> Prior to working for the Company, I had no experience as a paralegal, had not had any paralegal training, and had never worked for a law firm or been involved in paralegal activities. I was trained by Duane Varbel, the original president, for part of a day to be a credit specialist. I learned most of my paralegal responsibilities by reviewing old petitions. When I had questions, I would contact paralegal/credit specialists in other offices....

> The purpose of a paralegal/credit specialist was to sell bankruptcies, and company policy required me to file two petitions a day to keep my job [reference to exhibit]. The Company paid bonuses for selling the most bankruptcies and would occasionally hold contests to determine who could sell the most bankruptcies [reference to exhibit]....

> During the course of preparing and filing bankruptcies, I made decisions on exemptions.... I was not supervised by the Company's attorney....

Jennifer Kung tells an identical story:

> When I started at Hessinger as a paralegal, I was not given any guidance or training. At that time, my job entailed interviewing clients and completing petitions and schedules. Throughout my time with Hessinger, it was the routine practice in the firm for a credit specialist or paralegal to complete the schedules and petitions for the attorney to sign.

■ The conduct of Hessinger's credit specialists, many of whom had no formal training of any sort, was clearly the unauthorized practice of law. *In re Glad,* 98 B.R. 976 (9th Cir.BAP 1989).

The incidental availability of a lawyer does not make the practice legal where the attorney exercised no actual and significant supervision over the nonlawyer. See *Glad,* supra; *In re Stone,* 166 B.R. 269 (Bkrtcy.W.D.Pa. 1994). In *Stone,* the court held that a paralegal had been engaged in the unauthorized practice of law when he prepared bankruptcy petitions even though he had a lawyer check his paperwork for mistakes because the lawyer had no way of knowing what legal advice the paralegal had given or whether the advice was proper. 166 B.R. at 275. Here, the record shows that it was Hessinger's practice to present petitions prepared by nonlawyer "credit specialists" in large quantities for the few lawyers to sign, without even checking for obvious errors. Even if the Hessinger lawyers reviewed the credit specialists' work, Hessinger would still be guilty of aiding in the unauthorized practice of law. The fact that most of such petitions are signed without any review at all makes the offense particularly egregious.

## VII. Collection of Unconscionable Fees

■ As noted above, at least two Hessinger attorneys pointed out to Cook that to charge a four-figure fee in every case is unconscionable and a violation of Rule 4–200(A) of the California Rules of Professional Conduct. Cook's response was to get rid of these lawyers. Hessinger apparently has no such qualms, and has accordingly violated this rule in hundreds or thousands of cases.

In one case now before this court, *In re Eleccion,* No. 94–10095, the debtor had only $2300 in assets including a $1300 rental security deposit. He had no secured debt, and $14,113.00 in unsecured debt. The case was as simple as they come, at least from the information Hessinger's "credit specialist" was able to garner. Even a seasoned bankruptcy lawyer would charge no more than $500 or $600 for such a bankruptcy, after first counseling the debtor as to other alternatives because of the small total debt.

Many attorneys of lesser experience would charge around $300. Hessinger's fee in the case was $1,000.

Eleccion was lucky enough to draw an attorney instead of a credit specialist. The attorney was not a member of the California Bar; had never attended an American law school; had never had any courses in bankruptcy; had essentially no continuing legal education in bankruptcy; did most of his training "by research"; and had been employed as a lawyer for only about a month. Services from such a lawyer were next to worthless even if the case had proceeded properly, because of the poor qualifications of the attorney. Even so, the case did not proceed properly. The attorney failed to notify Eleccion of the need to appear for his 341 hearing, and then himself failed to appear at the continued meeting.

The case of *Deborah Anne Sogge,* No. 93–13120, is even worse. Although charged only $950, she was talked into filing by a credit specialist she thought was a lawyer and never spoke to a Hessinger attorney until the hearing on the court's order to show cause due to her failure to appear at her 341 hearing.[5] Hessinger hired an outside lawyer, who had never met Sogge, to appear at the 341 hearing for $50. Like Eleccion, Sogge had minimal assets and debts. She got no counseling and no effective representation. The total value of what she received can be fixed at $170: the $120 the court allows typing services to charge for typing bankruptcy papers, plus $50 for the stranger with the lawyer's license to sit next to her at the 341 hearing.

From the overwhelming record supplied by the U.S. Trustee, the court has no difficulty in finding that in the vast majority of Hessinger's cases the fees are unconscionable. The fees are set by nonlawyers, with no

regard for the simplicity of the case. The cases are prepared either by nonlawyers or very inexperienced and unqualified lawyers. The individuals receive no counseling, and in fact are looked upon as customers to be bilked and milked rather than clients. The court finds that by charging fees in excess of those charged by experienced practitioners and delivering services of the lowest order Hessinger has violated Rule 4–200(A).

## VIII. Conclusion

■ Although the court has found hundreds or thousands of serious violations of the California Rules of Professional Conduct, it is important to note that even one single use of the "six minute sell" to one single client is enough justification for revoking an attorneys' license to · practice. Hessinger's violations of ethics are rampant and outrageous, and demand the strongest possible sanction. Accordingly, the court will order as follows:

1. Pursuant to Local Rule 110–6, an order to show cause will be issued requiring Hessinger to show cause to the district court, if any he has, why he should not be disbarred from practice in this district for the conduct set forth in this memorandum.

2. Pursuant to Local Rule 110–7, the court assesses a fine against Hessinger in the amount of $100,000.00, to be paid to the clerk of the court. Until the fine is paid in full, Hessinger and his firm will not be permitted to practice bankruptcy law in this district, nor charge any person any fee whatsoever ·for any bankruptcy-related service in this district. Provided, however, that any other judge in this district may modify this order as to cases pending before him or her as he or she sees fit.[6]

---

**5.** The production of Sogge by Hessinger to endorse his conduct was a particularly cynical and disgusting exercise. She obviously had no understanding of the proceedings and no ability to evaluate the services she had received. Naive and trusting, she was the perfect mark for Hessinger.

**6.** This court has the power to issue a district-wide order, but is not so presumptuous as to issue an order telling any of the other judges of

this district who may appear before them. However, after reviewing this memorandum and the voluminous record upon which it is based, they may wish to concur in this ruling rather than hold their own hearings. It is the intent of this court to give them the option. The orders issued by the court will accordingly be in effect district wide, but subject to modification by each judge as to cases pending before him or her.

**374**

3. All trustees in this district will be instructed to remit any fees due to Hessinger & Associates to the Clerk of the the Court until the fine is paid in full.

4. Hessinger and his firm and its employees will be enjoined from practicing bankruptcy law in this district and from charging any person any fee whatsoever for any bankruptcy-related service in this district so long as Hessinger or his firm employs in any capacity or does any business whatsoever with Earl Cook, David Hansen, Turan Kahraman, or any corporation, partnership, or other business or entity which employs any one of such persons or is owned in any way, directly or indirectly, by such persons. Subject, as in paragraph 3, to the discretion of the other bankruptcy judges as to cases pending before them.

Pursuant to FRBP 9021, appropriate orders will be entered.