In re Anthony J. CAMPANELLA, Debtor.

Bankruptcy No. 96–31974DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

April 10, 1997.

Anthony J. Campanella, Philadelphia, PA, pro se.

Gloria M. Satriale, Chester Springs, PA, Trustee.

John D. McLaughlin, Jr., Frederic Baker, Philadelphia, PA, Assistant United States Trustees.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently before this court is the issue of whether this court should take measures to protect debtors from the practice of the Divorce and Bankruptcy Center, Inc. ("the Center"), whose sole principal is non-attorney Richard Kramer, of selling "bankruptcy kits" consisting of written instructions for filing bankruptcy, many of which are erroneous or misleading. The result which we reach is similar to that of *In re Evans,* 153 B.R. 960 (Bankr.E.D.Pa.1993). We are not completely convinced that the Center is engaged in the unauthorized practice of law, but we are quite certain that the Center has grossly overcharged ANTHONY J. CAMPA-NELLA ("the Debtor") and its other bankruptcy customers for the "services" provided, in light of the obsolete, misleading, and basically useless information incorporated in the kits. We also find that, in the Debtor's case, this practice violated Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 1006(b)(3). Therefore, we herein order that the Center refund the total fee charged plus tax of $147.34 charged to the Debtor for the sale of a bankruptcy kit to him. We will further enjoin the Center from continuing to distribute bankruptcy kits in all of its places of business in New Jersey and New York.

### B. FACTUAL AND PROCEDURAL HISTORY

The Debtor filed the underlying voluntary individual Chapter 7 bankruptcy case *pro se* on December 10, 1996. On that same day, he also filed an Application ("the Application") seeking to obtain a waiver of the Chapter 7 filing fees under the *in forma pauperis* ("IFP") pilot program ("the IFP Program")[1] in which this district is one of six participants. Noting that the Debtor's monthly gross income disclosed in the Application ($2,640) exceeded the monthly expenses disclosed in the Application ($1,103) by over $1,500, we scheduled a hearing on the Application, as opposed to granting it, on January 9, 1997. Though not disclosed on Local Bankruptcy Form ("L.B.F.") 2016.1,[2] we learned, through the Debtor's testimony at that hearing, that he had allegedly paid a fee of $175 to the Center, at a Cherry Hill, New Jersey, location, for certain services in connection with his bankruptcy filing as a charge for "assisting the Debtor in filing or preparing his papers."

In light of this discovery, we issued an order of January 10, 1997, requiring the Center to respond to inquiries regarding what services were provided to the Debtor, what sum was charged, the identities of other debtors which the Center assisted in filing

---

1. *See In re Stephenson,* 205 B.R. 52, 55–56 (Bankr.E.D.Pa.1997); and *In re Clark,* 173 B.R. 142, 144–46 (Bankr.W.D.Tenn.1994), for a description of the IFP Program.

2. *See In re Gavin,* 181 B.R. 814, 816 & n. 1 (Bankr.E.D.Pa.), *adopted,* 184 B.R. 670 (E.D.Pa. 1995), for a full description of L.B.R. 2016.1 and the local rule to which it relates, Local Bankruptcy Rule ("L.B.R.") 2016.1(c). This form requires, essentially, that *pro se* debtors disclose any fees paid to attorneys or non-attorneys who assisted or advised the debtor in filing bankruptcy.

bankruptcy petitions, and how the Center's services are advertised, as we do in all cases where substantial sums paid to lay advocates are disclosed on L.B.R. 2016.1 or are otherwise uncovered. In that order, we further directed that the Debtor and a representative from the Center appear at a hearing on February 27, 1997, to show cause why the Center should not be compelled to refund any sums charged to the Debtor, why it should not be permanently enjoined from assisting persons in filing bankruptcy petitions, why it should not be permanently enjoined from any violations of 11 U.S.C. § 110, and why it should not be subjected to the penalties set forth in 11 U.S.C. § 110. We also expressed an intention to deny the Debtor's IFP Application and to establish a schedule to pay the filing fees in installments at that hearing. After the February 27, 1997, hearing we established a schedule requiring the Debtor to pay four installments of $43.75 by April 30, 1997.

Kramer provided a written response to the inquiries in the January 10, 1997, Order on January 26, 1997. With regard to this court's query as to what services the Center performed for the Debtor, he stated that it supplied a

> *"DO IT YOURSELF*—PRO SE BANK-RUPTCY KIT," containing Blumberg legal forms, instructions, worksheets and sample sheets. DIVORCE CENTER did not type said forms for Debtor. DIVORCE CENTER does not offer a typing service for bankruptcy forms, and we never have. Additionally, DIVORCE CENTER offers no legal advice to debtors, and offers no verbal advice on how to fill out said forms.

The fee charged to the Debtor was disclosed as $139.00 plus a six (6%) percent sales tax, or $147.34. In response to the inquiry as to why no refund should be made, Kramer stated that "the Court has no basis or precedent to order a refund of the sale of do it yourself pro se kits and forms." With regard to the names and case numbers of any other bankruptcy cases for which the Center charged debtors a fee for assisting them, Kramer replied: "None. Divorce Center does not type, fill out, prepare or file any bankruptcy forms." Finally, of the Center's advertisements, Kramer responded: "Any advertising DIVORCE CENTER does for bankruptcy kits contains the following text: 'Chapter 7 Bankruptcy Kits—$139 plus tax and Court Fee.' No other services for bankruptcy are offered." Kramer was subsequently orally requested to supply a copy of the kit to the court, and he did so shortly before the hearing.

The Debtor, Kramer, and an Assistant United States Trustee ("UST") appeared at the February 27, 1997 hearing. The Debtor testified that, while he drove around the block, his girlfriend picked up the bankruptcy kit and paid the requested fee for him to the Center, and that he then gave the kits to his sister to fill out the bankruptcy papers for him. The Debtor made no further inquiries of the Center after obtaining the forms from it. He was uncertain what role the kit had played in the completion of his forms by his sister, or whether she had ever contacted the Center again.

Although the Debtor's financial affairs appear simple, the Schedules were filled out with a significant number of errors. Except for a car, no property, even clothing, was listed or claimed as exempt. No choice of the federal or state exemptions was made in exempting the car. The form was left completely blank at all places where "None" was requested to be entered, if applicable. The Schedules I and J reflected over $1,000 excess monthly income, which could have triggered a motion under 11 U.S.C. § 707(b), and which did totally undermine the merit of the IFP Application.[3]

Kramer's testimony revealed that he is no stranger to the issue of the unauthorized practice of law. He testified that other offices of the Center, its predecessors, and he himself had been the subjects of charges of unauthorized practice of law for over ten years in New Jersey, where the Center has

---

**3.** The Schedules I and J reflect monthly net income of $1,822.00 and monthly expenses of $814.00, which are not totally consistent with the disclosures in the Application, but continue to indicate a substantial excess available to pay the filing fee and at least certain sums to the Debtor's creditors.

six places of business, in addition to an office in Manhattan.

An opinion published as *New Jersey State Bar Ass'n v. Divorce Center of Atlantic County,* 194 N.J.Super. 532, 477 A.2d 415 (1984) (cited hereinafter as *"N.J. Bar"*), describes a suit by the plaintiff Bar Association against Kramer and his Atlantic County business to prevent its sale of divorce kits on the ground that their sale constituted the unauthorized practice of law. The *N.J. Bar* court thusly described the respondents' services:

> The practice followed by the Divorce Center … goes beyond the selling of legal forms. The exchange between the representative of the Divorce Center and the customer includes the giving of advice and the interpretation of raw data for purposes of completing the various pleadings … The use of the advertising scheme, when combined with the manner in which the information is gathered and interpreted both verbally and in writing, creates an impression to the customers that the services rendered by defendants include expertise, guidance and advice in the area of divorce. The so-called "typing" service, for example, appears to be a veiled way of providing claimed expertise and guidance which go well beyond the mere typing of a form…. The proofs also included evidence of encouragement from representatives of the Divorce Center to have customers falsify information as part of the divorce complaint.

194 N.J.Super. at 536, 477 A.2d at 417. While the court determined that New Jersey followed the "liberal view," per Annot., *Sale of Books or Forms Designed to Enable Layman to Achieve Legal Results Without Assistance of Attorney as Unauthorized Practice of Law,* 71 A.L.R.3d 1000, 1008–09 (1976) (cited hereinafter as "Annot."), that sale of do-it-yourself legal kits and instructions alone does not constitute the unauthorized practice of law, 194 N.J.Super. at 538, 477 A.2d at 418, it found that the services offered by Kramer and his Center went far beyond the mere sale of such kits and instructions. *Id.* at 536, 477 A.2d at 417. Thus, the court held that Kramer and the Center had committed the unauthorized practice of law. *Id.* at 543, 477 A.2d at 420–21.

During the hearing and in his post-hearing submission, Kramer expressed, with an air of overbearing arrogance laced with vitriol directed at attorneys generally, and the UST in particular, that the *N.J. Bar* opinion had completely vindicated him and his practices. Like many of Kramer's assertions, these statements were more than slightly inaccurate.

The bankruptcy kit supplied to the Debtor which is in issue here is comprised of "Book 1 Chapter 7 Personal Bankruptcy Guide" and Book 2, which is simply a copy of the official bankruptcy forms which Kramer testified that he purchased for $12 to $14 from "Blumberg," apparently a stationery store. Kramer contended that the official forms were purposefully devised by lawyers to be incomprehensible to lay persons and that the mysteries of the forms could be unlocked by the use of his kits, the text of which he wrote himself, allegedly after consultation with lawyers. As training for this undertaking, Kramer referenced only a six-month paralegal course which he had taken "several years ago" at a community college in New Jersey, of which the instructor was a New Jersey state court judge who emphasized New Jersey domestic relations practice in his curriculum. No degrees of any sort were claimed by Kramer.

Book #1 begins with a two and a half page INTRODUCTION, following a full-cover page and half page Table of Contents. The cover page includes the reassuring statement that "ANY INADVERTENT ERRORS AND OMISSIONS THAT MAY HAVE OCCURRED DESPITE A VERY CAREFUL SCRUTINY BY THE PUBLISHER ARE REGRETTED BUT CANNOT CAUSE LIABILITY ON THEIR PART FOR LOSS OR DAMAGE RESULTING FROM USE OF THIS MATERIAL."

The text of this INTRODUCTION includes the statement that "[o]ver 250,000 bankruptcy petitions are filed each year," which is correct though somewhat misleading when it is noted that over 1,000,000 bankruptcy cases were filed in this country in 1996. A $175 filing fee is referenced, with no

mention that this figure refers only to the Chapter 7 cases to which the kit is addressed and that the filing fees for chapter 11 ($800), chapter 12 ($200), and Chapter 13 ($160) are different. This court's IFP Program is not referenced. It is also stated that

> [a]bout one month after you file your petition you will meet in Court with a Court appointed trustee. The trustee is responsible for determining which assets you own, if any, may be divided among your creditors. Approximately 2 months later you will go to a Court hearing, and the Judge will discharge you from your debts.

Among the instructions are the following:

> B. Close all your checking accounts only after you are sure the last check has cleared.
>
> .   .   .   .   .
>
> D. Sell as many non-exempt assets as you can and buy exempt items with the money. . . .
>
> .   .   .   .   .
>
> G. Approximately 4–6 weeks after filing you will receive by mail a notice of a meeting with your creditors. In most cases your creditors will not appear, however you MUST attend this meeting. At this time you will be appointed a court trustee, who will be responsible for determining how non-exempt assets may be divided among your creditors.
>
> .   .   .   .   .
>
> H. Within 2–3 months after the meeting if all goes well, you will receive a notice setting the time and date for a hearing. At this meeting you will be formally discharged from your debts.

We would note that there is no reason for a consumer debtor to close current checking accounts because of a bankruptcy filing; it may constitute a fraudulent conveyance or a ground to deny discharge under 11 U.S.C. § 727(a)(2) to sell non-exempt assets within a year of a bankruptcy filing; that the trustee is appointed long prior to the meeting of creditors, at which a permanent trustee may

be elected; that no trustee is likely to sell modest non-exempt assets; and that discharge hearings have not been conducted in most courts since the 1990 Code Amendments.

Appendix A of the test, addressing exemptions, includes the following advice:

> 3. **WAGES.** Under Federal Law you, as a *debtor*, are allowed to exempt three-fourths of the wages not yet paid for work you have done in 30 days prior to filing. You may be able to keep all your wages by filing for bankruptcy the day after pay day. In this manner you would use your paycheck to purchase some other exempt property such as food.

This statement makes it appear that one-quarter of a debtor's wages are not exempt and can be reached by the trustee, which is not correct. A chapter 7 debtor's post-petition wages are not "property of the estate."

The federal exemption amounts are recited, with no indication that state law exemptions may be chosen and with a mixture of amounts established prior to and after the 1994 amendments,[4] *e.g.*, the present limits of §§ 522(d)(1) and (d)(2) are recited, but the pre-amendment limits formerly appearing in §§ 522(d)(3), (d)(4), (d)(5), (d)(6), (d)(8), and (d)(11)(D) are referenced. "Health insurance benefits," which are not referenced in § 522(d), are said to be exempt, and the exemptions designated in §§ 522(d)(7), (d)(9), (d)(10)(C), (d)(10)(D), (d)(10)(E), (d)(11)(A), (d)(11)(B), and (d)(11)(C) are not mentioned. The "means test" of § 522(d)(11)(E) is also not mentioned.

Appendix B purports to generically distinguish SECURED AND UNSECURED DEBTS in the following passage, quoted in full:

> **UNSECURED DEBTS**—are those debts created when you purchase an item or borrow money or do not make a *written pledge* to use some of your property as collateral in the event you do not pay.
>
> EXAMPLE:

---

**4.** But see pages 442–443 *infra,* where the instructions direct the debtor to take the *state* exemptions.

1. If you made purchases on your credit card you incurred an unsecured debt.
2. If you have hospital bills or doctor bills these are unsecured debts.

**SECURED DEBTS**—are debts in which you have made a *written pledge* that, in the event you do not pay, the creditor may repossess the item purchased or confiscate any item that you have placed as collateral for the debts.

EXAMPLE:

1. If you purchased an automobile on credit, that is a secured debt.

No explanation is made that debts on certain credit cards issued by retailers are claimed by these retailers to be secured. No mention is made of the possibility that a loan for an automobile may be written as a cash advance without security. No mention is made of whether a home mortgage might constitute a secured debt. No effort is made at this point to describe what priority debts are.

Appendix C addresses DISCHARGEABLE AND NON–DISCHARGEABLE DEBTS. A reference is made to debts which are nondischargeable under 11 U.S.C. §§ 523(a)(1), (a)(2)(A),[5] (a)(2)(B), (a)(3), (a)(5), (a)(6), (a)(8), and (a)(9). The rather common grounds for claiming nondischargeability appearing in §§ 523(a)(2)(C), (a)(4), (a)(6) and (a)(15) are not mentioned. The fact that creditors must initiate proceedings to raise §§ 523(a)(2), (a)(4), (a)(6), and (a)(15) dischargeability exceptions is not referenced, nor the fact that these debts may be discharged in a Chapter 13 case.

Appendix D provides addresses for the courts where bankruptcy cases can be filed in New York City and New Jersey. It advises that filings in "counties not listed above" can be filed in Camden, New Jersey, which could suggest that Pennsylvania customers like the Debtor could file their cases in Camden.

Appendix E describes two "hearing procedures." The first is a description of the meeting of creditors and a list of questions generally asked by trustees. The description of the second hearing, a discharge hearing, is included in detail, in pertinent part as follows, despite that all known courts no longer require same except when debts are sought to be reaffirmed in light of the 1990 Code Amendments:

**HEARING PROCEDURE # 2**

Eventually you will receive a Notice for a Discharge Hearing. The notice will advise you of the date, time and place of this hearing. You must attend this meeting. If you do not attend, your entire discharge may be revoked and then you are back where you started from.

At the hearing, the Judge will come out and attendance will be taken. When your name is called, simply say "here". The Judge will then give a speech on what it means to go bankrupt and then discharge everyone on record.

You will not really be required to say anything but there may be two pages to sign.

The first is a statement confirming that you waive the presence of an attorney at the meeting. The second asks whether you wish to reaffirm any debts. If you reaffirm a debt, this means that you will be obligated to pay the balance of this debt after the bankruptcy. It is not wise to reaffirm any debts since the purpose of going bankrupt is to do away with all of your debts, not to continue paying old ones. However, there may be exceptions:

*EXAMPLE:* A bank will not repossess a car, etc. if you agree to reaffirm a debt. Under such circumstances if may be to your advantage to reaffirm a debt.

In addition to the obsolescence of the reference to the discharge hearing, the materials fail to explain that it is often not necessary or advisable to reaffirm a debt to retain a car or other property.

---

**5.** The recitation of debts purportedly within the scope of § 523(a)(2)(A) includes the following curious passage:

> if you purchased any property on credit *after* you decided to file bankruptcy, this would be considered fraudulent and your debt may not be discharged. *REMEMBER*—once you decide to file bankruptcy, *STOP* incurring any new debts.

We would suggest that a chapter 7 debtor is not precluded from accepting credit post-petition and to do so would not be fraudulent conduct. The debt would be nondischargeable because it was obtained post-petition.

Appendix F, entitled "ABOUT LAW-YERS," includes the following statements:

There are times when you need a lawyer and there are times when you don't. This bankruptcy kit is to be used if your personal bankruptcy is not complicated or unusual. It should be simple and straightforward. If you feel that you need a lawyer, or as you reach the instructions you are told that you should contact a lawyer, there are several options open to you.

1. You can hire a lawyer for consultation on a specific problem. Once you have consulted with the attorney and he has solved the problem you may continue with completion of your forms. A lawyer should charge you by the hour. A reasonable rate is generally from $50–75 per hour. If you consult with him for approximately 20–30 minutes he should charge you only $15–37....

To the disappointment of the customer, most lawyers would be unlikely to limit fees to the rates noted here. A list of New York City and New Jersey lawyer referral services and free legal assistance programs is provided. No Pennsylvania references are included, in particular the Consumer Bankruptcy Assistance Project in Philadelphia or the Delaware County Consumer Bankruptcy Assistance Project, which could provide free services to many Pennsylvania customers. The IFP Program is also not mentioned.

Appendix G advises that the debtor will not be discharged from debts omitted from the Schedules, advice which may be erroneous in light of the decision in *Judd v. Wolfe*, 78 F.3d 110, 116 (3d Cir.1996). It provides a form for making what it claims is a necessary amendment to a debtor's Schedules to add creditors. The $20 fee for this filing is erroneously disclosed as $10.00.

Appearing next in this set of instructions are three printed sheets, the first of which is headed as follows:

*THE FOLLOWING IS A LIST OF QUESTIONS AND ANSWERS WHICH YOU SHOULD READ BEFORE YOU DECIDE TO FILE FOR BANKRUPTCY*

Among the fourteen questions and proposed answers are the following:

Q. Must I be a resident of the State in which I file bankruptcy?

A. Yes. You are considered a resident of the State in which you have lived for the greatest time during six months prior to filing.

Q. Is there any other requirement for filing bankruptcy other than being insolvent?

A. None.

. . . . .

Q. Can I keep everything that I acquire after the date on which I filed for bankruptcy?

A. Generally, yes, although there are several exceptions as follows:

1. Inheritance, or proceeds of a life insurance policy, if the deceased has died within 6 months after the bankruptcy petition has been filed.

2. Insurance payments for losses suffered before bankruptcy petition was filed, but not yet received at the time of bankruptcy.

3. Tax refunds which were due, but not received at the time bankruptcy was filed.

4. Money recovered in a law suit, if you filed the law suit before you filed for bankruptcy, and have not been compensated prior to filing.

We would suggest that the answer to the first question is "No;" the explanation fails to note that venue may exist in the debtor's place of doing business or location of the debtor's principal assets for the greatest time in the 180 days preceding the filing. Insolvency is not a prerequisite for filing. The explanation of property that may be kept fails to explain that all of the property described becomes "property of the estate," which can be retained if it is properly exempted. The reference to lawsuit claims is unclear because it fails to explain that all rights to recover money will be likely to be considered "property of the estate." When a

lawsuit is filed and money is recovered is not really relevant to this inquiry.

After the questions and answers appear five IMPORTANT THINGS TO REMEMBER, the fourth of which reads as follows:

4) A referee will examine your forms and ask questions concerning your bankruptcy. Do not get flustered. You are not being challenged in any way. The referee is just trying to get all the information he needs. Simply answer the questions in accordance with the information you have written into your forms.

Referees in bankruptcy were replaced with bankruptcy judges upon the enactment of the Bankruptcy Code in 1978. No mention is made here or elsewhere of the role of the UST.

The final portion of the "Book" is a set of forms with number-coded instructions which purportedly make it easier for the customer to fill out the Schedules. Among the instructions (for all debtors, it apparently having been arbitrarily decided that these answers are applicable to all debtors) on the Petition are the following:

12. Check Non–Business Consumer.

13. Check Chapter 7.

Most of the other so-called instructions appear to either reiterate the obvious self-explanatory pieces of information required by the Schedules or over-simplify the information requested, and they ignore those aspects apparently not thoroughly understood by Kramer himself.

Among the other instructions are the following.

Schedule A (Real Property)

1. If you do not own a home or any real estate, Enter "None"

2. If you do own a home or other real estate, you should consult with an attorney.

Until this point, the customer of the Center who is a homeowner has not been informed that a lawyer is needed and that the charges paid to the Center were, in all probability, a waste of money. No refund is offered in any circumstances.

Schedule C (Exemptions)

2. Check bottom box 11 USC 522(b)(2)

This instructs the debtor to take the *non-*federal exemptions, despite the fact that Appendix C *supra* and the sample filled-out form describes only the federal exemptions. *See* pages 439–440 *supra.*

Schedule E (Priority Creditors)

DEFINITION: THIS FORM WILL USUALLY BE USED ONLY BY INDIVIDUALS ENGAGED IN BUSINESS. YOU SHOULD CHECK BOX *2 [indicating no such creditors] UNLESS YOU OWE TAXES IN WHICH CASE YOU SHOULD CHECK BOX 3F AND FILL IN THE APPROPRIATE INFORMATION

This instruction misstates the box to check if a debtor's tax debt is anything other than for unpaid withholding taxes (Box G; Box F references a withholding tax liability) and ignores the fact that many debtors owe income tax debts, alimony, or possibly security deposit priority debts.

Schedule M (co-debtors)

DEFINITION: This form lists any people who co-signed debts for you.

This "definition" ignores the fact that many, if not most, co-debtors are co-obligors, and also could be parties for whom the debtor co-signed, not just co-signers for the debtor.

Schedule I (Income) includes the following instruction to the debtor:

17. Fill in all information for your spouse if you are filing JOINTLY.

This instruction erroneously suggests that information regarding the income of a spouse can be omitted if an individual case is filed.

At the conclusion of the hearing of February 27, 1997, we accorded the UST until March 10, 1997, to file a post-trial submission, and gave Kramer until March 31, 1997, to reply. In his submission, the UST argued that the inclusion of explanatory materials in the kit constituted provision of legal advice in a written form, which allegedly constituted the unauthorized practice of law, citing principally *In re Herren,* 138 B.R. 989 (Bankr. D.Wyo.1992), in support. In addition, the UST argued that the Center grossly over-

charged for advice which was, in many respects, incorrect or misleading.

Kramer's response included principally the following:

1. A contention that the *N.J. Bar* decision, the only reported case which he cited, and other uncited New Jersey proceedings have specifically authorized his practices, and those results should be binding on this court.

2. A claim that he was denied due process because this matter was raised as an "offshoot" from the Debtor's bankruptcy case rather than by a separate proceeding.

3. Diatribes such as accusing the UST of "book burning," arrogance (an ironic criticism), and unjustifiably emphasizing the responsibilities and duties of lawyers.

## C. DISCUSSION

The principal legal issue raised by the UST is whether the Center and Kramer engaged in the unauthorized practice of law by selling the bankruptcy kits described at pages 438–442 *supra.* In this analysis, it must be recalled that, in the case of the Debtor, the Center did no more than sell him the kit. There is no evidence to rebut Kramer's contention that this is all that the Center does in any circumstances and that it never provides other written or oral assistance to its bankruptcy customers. If it did provide such advice, a very easy case for the UST could be made.

We note at the outset the absence of specific reference in the Bankruptcy Code and Rules to such kits and their treatment by bankruptcy courts, most likely because the existence of such kits was simply not contemplated by the Code's draftspersons. For example, the Code section added in the 1994 amendments addressing "persons who negligently or fraudulently *prepare* bankruptcy petitions" (emphasis added), 11 U.S.C. § 110, is not applicable. The evidence in this case indicates the Center did not prepare the petition for the Debtor. *Compare Gavin, supra,* 181 B.R. at 820–25.

The UST suggested, during the hearing, that the Center might be subject to F.R.B.P. 2016. However, that Rule appears to only require attorneys or other entities seeking compensation from a debtor's estate to file fee applications. Nevertheless, we do find the power to broadly supervise the activities of the Center in three sources: (1) L.B.R. 2016.1(a), which requires disclosure of monies paid or agreed to be paid to any entity that "assisted in or advised" the debtor in the filing of a bankruptcy case; (2) F.R.B.P. 1006(b)(3) which provides as follows:

> (3) *Postponement of Attorney's Fees.* The filing fee must be paid in full before the debtor or chapter 13 trustee may pay an attorney or any other person who renders services to the debtor in connection with the case;

and (3) the considerable body of caselaw holding that

> it is highly proper for this court to regulate the practices and compensation of lay advocates as well as attorneys who practice before it pursuant to 11 U.S.C. § 329 and Federal Rules of Bankruptcy Procedure 2016 and 2017. *See In re Fleet,* 95 B.R. 319, 337–38 (E.D.Pa.1989) (FULLAM, J.) ("*Fleet I* "). *Accord, In re Glad,* 98 B.R. 976, 977 (9th Cir. BAP 1989); *In re Harris,* 152 B.R. 440, 446–47 (Bankr.W.D.Pa. 1993); *In re Minchew,* 150 B.R. 275, 277 (Bankr.N.D.Fla.1992); *In re Herren,* 138 B.R. 989, 995–96 (Bankr.D.Wyo.1992); *In re Webster,* 120 B.R. 111, 114 (Bankr. E.D.Wis.1990); and *In re Bachmann,* 113 B.R. 769, 774–75 (Bankr.S.D.Fla.1990).

*Evans, supra,* 153 B.R. at 966.

We have little doubt that the Center assisted, advised, and rendered services to the Debtor for compensation in this case. We also have little doubt that § 110 did not pre-empt the "traditional" bankruptcy court authority to regulate lay advocates who engage in activities other than preparation of bankruptcy petitions. *See Gavin, supra,* 181 B.R. at 821. Contrary to the Debtor's assertion that the matter was an improper "offshoot" of the Debtor's case, that is precisely how the issue was raised in *In re Skobinsky,* 167 B.R. 45, 47 (E.D.Pa.1994); and *Evans, supra,* 153 B.R. at 962–63, as well as in numerous other instances.

In deciding whether particular activities constitute the unauthorized practice of

law, a bankruptcy court must apply the law of the state in which it sits as authority. *Skobinsky, supra,* 167 B.R. at 49; *Evans, supra,* 153 B.R. at 966–67; and *In re Harris,* 152 B.R. 440, 444 (Bankr.W.D.Pa.1993). The relevant Pennsylvania statute making the practice of law by non-attorneys illegal provides that

any person, including, but not limited to, a paralegal or legal assistant, who within this Commonwealth shall practice law, or who shall hold himself out to the public as being entitled to practice law, or use or advertise the title of lawyer, attorney at law, attorney and counselor at law, counselor, or the equivalent in any language, in such a manner as to convey the impression that he is a practitioner of the law of any jurisdiction, without being an attorney at law or a corporation complying with 15 Pa.C.S. Ch. 29 (relating to professional corporations), commits a misdemeanor of the third degree upon a first violation. A second or subsequent violation of this subsection constitutes a misdemeanor of the first degree.

42 Pa.C.S. § 2524(a).

■ This statute, and its predecessors, were enacted to "assure to the public adequate protection in the pursuit of justice." *Harris, supra,* 152 B.R. at 444. *See also Dauphin County Bar Association v. Mazzacaro,* 465 Pa. 545, 552, 351 A.2d 229, 233 (1976); *Shortz v. Farrell,* 327 Pa. 81, 91, 193 A. 20, 24 (1937); *Childs v. Smeltzer,* 315 Pa. 9, 15, 171 A. 883, 886 (1934); and *Shortz v. Yetter,* 38 Pa.D. & C. 291, 297 (Luzerne Co. C.P.1940). This court has the power to enjoin the conduct of the Center and Kramer insofar as their actions constitute the unauthorized practice of law. *See Skobinsky, supra,* 167 B.R. at 47; and *O'Connell v. David,* 35 B.R. 141, 144 (Bankr.E.D.Pa.), *adopted in part,* 35 B.R. 146 (E.D.Pa.1983), *aff'd,* 740 F.2d 958 (3d Cir.1884). Thus, if Kramer or the Center were found to have violated the Pennsylvania statute prohibiting unauthorized practice of law, they could be enjoined from persisting in such activity by this court.

There is also a public policy interest in providing that only those persons who are authorized and qualified to provide legal services to citizens be allowed to provide such services. On this note the Pennsylvania Supreme Court has stated that

[w]hile, in order to acquire the education necessary to gain admission to the bar and thereby become eligible to practice law, one is obliged to "scorn delights, and live laborious days," the object of the legislation forbidding practice to layman is not to secure to lawyers a monopoly, however deserved, but, by preventing the intrusion of inexpert and unlearned persons in the practice of law, to assure to the public adequate protection in the pursuit of justice, that which society knows no loftier aim.

*Farrell, supra,* 327 Pa. at 91, 193 A. at 24. *See also In re Arthur,* 15 B.R. 541, 545 (Bankr.E.D.Pa.1981); and *Childs, supra,* 315 Pa. at 15, 171 A. at 886.

■ The Pennsylvania courts have understandably been unable to specifically define the practice of law, except to say that it is more than mere appearances in court and the conduct of litigation and that it involves the application of legal knowledge and technique. *Dauphin County Bar, supra,* 465 Pa. at 553, 351 A.2d at 233; *Farrell, supra,* 327 Pa. at 84–85, 193 A. at 21; and *Yetter, supra,* 38 Pa.D. & C. at 298. This court is therefore obliged to "invoke its broad equity powers to develop and define the parameters of the practice of law in a bankruptcy proceeding." *Arthur, supra,* 15 B.R. at 543. Thus, the standard for when a person is engaged in the practice of law is "whenever and wherever the services require legal knowledge, training, skill, and ability beyond those possessed by the average man." *Id.* at 546. *See also Farrell, supra,* 327 Pa. at 85, 193 A. at 20; and *Blair v. Motor Carriers,* 40 D. & C. 413, 420 (Phila.Co.C.P.1939). The courts have declined to specifically define the "practice of law" because an attempt at so doing "would be more likely to invite criticism than to achieve clarity." *Farrell, supra,* 327 Pa. at 84, 193 A. at 21. *See also Harris, supra,* 152 B.R. at 445; *Arthur, supra,* 15 B.R. at 543; and *Yetter, supra,* 38 Pa.D. & C. at 298. Consequently, it is clear that the preparation of pleadings and other types of legal papers and giving of advice in legal matters consti-

tutes the practice of law, because all of these activities require a familiarity with legal principles which are beyond a layperson's knowledge. *Childs, supra,* 315 Pa. at 11, 171 A. at 884. *See also Skobinsky, supra,* 167 B.R. at 49; *Evans, supra,* 153 B.R. at 966–67; *Harris, supra,* 152 B.R. at 445; and *Arthur, supra,* 15 B.R. at 545–46, 547.

While the Pennsylvania courts have not published any opinion addressing the use of bankruptcy kits, they have decided cases involving the unauthorized practice of law in somewhat analogous contexts. For example, in *Yetter, supra,* one defendant authored, and the second defendant distributed, a pamphlet entitled "A Practical Aid for Executors and Administrators of Decedents' Estates," utilizing advertisements which purported to give legal advice and instructions on how to draft wills and manage decedents' estates. 38 Pa.D. & C. at 291. The author defendant also drafted wills and other legal documents for people and advised them as to their alleged legal rights. *Id.* The author defendant in addition made himself available to customers for consultations on legal matters related to wills and estates. The court opined that

> [w]e are of the opinion that even upon the most liberal view of defendants' rights and upon the broadest interpretation of the privilege of free speech and free publication, we cannot escape the conclusion that the publication, circularizing, and sale of this pamphlet constituted an attempt unlawfully and unauthorizedly to practice law.

*Id.* at 296–97. The court thus held that the advice and instructions provided by the defendants in the pamphlet constituted the unauthorized practice of law.

In *Farrell, supra,* the defendant was a claims adjuster for an insurance company. On behalf of the company, he prepared and filed pleadings in workers' compensation cases in which the company was a defendant, and he appeared at hearings before referees and examined and cross-examined witnesses. 327 Pa. at 82, 193 A. at 20. The court determined that such activity constituted the unauthorized practice of law, and thus enjoined the defendant from further preparing

and filing pleadings and from representing the insurance company at these hearings.

Similarly, in *Dauphin County Bar, supra,* the defendant was an insurance adjuster who solicited tort claims from injured persons against their insurers or the tortfeasors. His practice was to investigate the accident, estimate the damages, write a demand letter to the other party, and attempt to negotiate a settlement. For his services, he received a ten to twenty (10% to 20%) percent contingent fee. 465 Pa. at 547–48, 351 A.2d at 230–31. However, the defendant defended his actions by claiming that he was authorized to act in the capacity in which he acted pursuant to the Public Adjuster Act of Pennsylvania. *Id.* at 548, 351 A.2d at 230–31. However, the Pennsylvania Supreme Court determined that the Public Adjuster Act did not authorize the defendant to act in the capacity in which he acted. *Id.* at 548–50, 351 A.2d at 232. Thus, the court concluded that his actions constituted the unauthorized practice of law. *Id.* at 554, 351 A.2d at 234.

In *Childs, supra,* the defendant was a notary public and stenographer. She advertised to real estate brokers and attorneys that she specialized in the preparation of mortgages, deeds, assignments, releases and other legal papers. In fact, she admitted to the court that she had drafted numerous legal documents including deeds of trust, wills, leases, bills of sale, partnership agreements, mortgages and deeds. 315 Pa. at 11, 171 A. at 884. She typically utilized preprinted forms on which she filled out the blanks, although she occasionally completely drafted legal documents for clients as well. *Id.* The Supreme Court held that this habitual preparation of legal documents by the defendant constituted the unauthorized practice of law. *Id.* at 13, 171 A. at 885.

In several federal cases applying Pennsylvania law to the issue of the unauthorized practice of law in bankruptcy cases, the courts found the defendants to have so acted. In both *Harris, supra,* 152 B.R. 440; and *In re Stone,* 166 B.R. 269 (Bankr.W.D.Pa.1994), the same person was the defendant. He was a "paralegal" who a ran a business entitled Affordable Legal Assistance. He advertised his bankruptcy petition preparation services

in newspapers in the "legal services" section of the classified ads, interviewed clients and prepared their bankruptcy petitions based on their responses, determined which schedules to file and what information to include thereon, explained the automatic stay provisions of the bankruptcy code, and advised clients that they could pay the filing fee in installments, among other services, for which he charged $135. *Harris, supra,* 152 B.R. at 442–43. The defendant directed the debtors to file their bankruptcy petitions *pro se* after he completed them.

After the defendant had been ordered and enjoined by the bankruptcy court in *Harris* to cease and desist from preparing bankruptcy petitions on behalf of debtors, he entered into an agreement with an attorney whereby he would prepare the bankruptcy documentation and would send the documents over to the attorney to review to ensure that they had been prepared in the proper manner. This act of frustrating the effect of the bankruptcy court's order in *Harris* resulted in further sanctions being imposed upon the defendant in *Stone.*

The clients never met with the attorney, but only with the defendant. The defendant held himself out to the public as having "practiced" law in California and that he was "partners" with another attorney, thus giving the impression that he was an attorney authorized to practice law in Pennsylvania. *Stone, supra,* 166 B.R. at 271–72. The debtor involved in *Stone* in fact thought that the defendant was an attorney having expertise in bankruptcy law. *Id.* Of course, he was not and, moreover, much of defendant's advice to debtor was incorrect. The defendant similarly prepared bankruptcy documentation for another debtor in *Stone* as well. *Id.* at 272–73. The court determined that the defendant was chargeable with unauthorized practice of law, and held that the defendant must disgorge all of the funds he collected to prepare bankruptcy petitions for debtors. *Id.* at 276. *See also Skobinsky, supra,* 167 B.R. 45.

In *Arthur, supra,* the non-attorney defendant's offending conduct included advising and counseling people regarding the Chapter under which they should file bankruptcy; their exemptions, dischargeability and the automatic stay; preparing and filing bankruptcy petitions; preparing and filing applications to pay the bankruptcy filing fees in installments; and advertising for clients through the newspaper and through the use of business cards. 15 B.R. at 543–44. He was paid $160 for services rendered to the clients and had filed approximately 75 bankruptcy petitions in the bankruptcy court. *Id.* at 544. The court determined that these activities, performed by the defendant, who was not licensed to practice law, constituted the unauthorized practice of law, since these activities required a "highly sophisticated legal judgment requiring legal knowledge, training, skill, and ability far beyond those possessed by the average man." *Id.* at 546. *See also O'Connell, supra* (on facts very similar to those in *Arthur* the bankruptcy court determined that the defendants' activities, for which they charged $150–$350, constituted the unauthorized practice of law).

While the Pennsylvania courts, both state and federal, have not issued any published opinions other than arguably *Yetter* involving situations in which the non-attorney provided basically only forms with instructions, as opposed to providing direct services in the form of advice as to how to fill out the forms, or personal consultations regarding the debtor's particular case, the courts of other jurisdictions have addressed this issue, mostly in the context of the sale of no-contest divorce kits. These opinions are instructive in that they discuss how the other jurisdictions came to their conclusions that the provision of forms with instructions either does or does not constitute the unauthorized practice of law.

In *State v. Winder,* 42 A.D.2d 1039, 348 N.Y.S.2d 270 (1973), the defendant, a non-attorney, sold "divorce yourself kits." The kits, sold for $75–$100 and consisted of forms and instructions in the matrimonial law and procedure for filing uncontested divorce petitions. *Id.* at 1039, 348 N.Y.S.2d at 271. The instructions provided with the forms did not purport to give specific, personal advice on a particular problem to a designated or identified person, which was essential under the definition of "legal practice" in New York. Thus, the sale of the forms with instructions,

by itself, was determined not to constitute the unauthorized practice of law. *Id.* at 1039, 348 N.Y.S.2d at 271. However, in this particular case, the defendant did give legal advise "in the course of personal contacts concerning particular problems which might arise in the preparation and presentation of the purchaser's asserted matrimonial cause of action or pursuit of other legal remedies and assistance in the preparation of necessary documents." *Id.* at 1040, 348 N.Y.S.2d at 272. Thus, the defendant was found to have conducted the unauthorized practice of law.

Similarly, in *In re Thompson*, 574 S.W.2d 365 (Mo.1978), the non-attorney respondent sold "divorce kits" to franchisees, who in turn sold them to the public. *Id.* at 366. The kits contained instructions and practice forms relevant to uncontested dissolutions of marriage. *Id.* The instructions included in the packet were of two types, "a set of general procedural instructions designed to instruct as to what forms to file, in what order and where, and instructions on how to prepare the forms." *Id.* At one time, the kits also included a cassette tape which restated the instructions, but this practice was eliminated prior to the hearing. *Id.* The court determined that, on the facts of this case, the respondent's advertisement and sale of the divorce kits did not constitute the unauthorized practice of law as long as they refrained from giving personal advice regarding legal remedies or consequences to the persons who purchased the kits. *Id.* at 369.

In *In re New York County Lawyers' Ass'n v. Dacey*, 28 A.D.2d 161, 283 N.Y.S.2d 984, *rev'd*, 21 N.Y.2d 694, 287 N.Y.S.2d 422, 234 N.E.2d 459 (1967), the defendant published a book entitled "How to Avoid Probate!" The book contained approximately 55 pages of text and 310 pages of forms. In reversing the trial court, the Court of Appeals adopted the dissenting opinion of the trial court, which stated:

It cannot be claimed that the publication of a legal text which purports to say what the law is amounts to legal practice. And the mere fact that the principles or rules stated in the text may be accepted by a particular reader as a solution to his problem

does not affect this.... Apparently it is urged that the conjoining of ... the text and the forms, with advice as to how the forms should be filled out, constitutes the unlawful practice of law. But that is the situation with many approved and accepted texts. Dacey's book is sold to the public at large. There is no personal contact or relationship with a particular individual. Nor does there exist that relationship of confidence and trust so necessary to the status of attorney and client. This is the essential of legal practice—the representation and the advising of a particular person in a particular situation.... At most the book assumes to offer general advice on common problems, and does not purport to give personal advice on a specific problem peculiar to a designated or readily identified person.

28 A.D.2d at 173–74, 283 N.Y.S.2d at 997–98. Thus, the appellate court concluded that the sale of the book was not the unauthorized practice of law.

In addition, the Florida courts are now following the trend of permitting the sale of kits consisting of the forms required to be filed to initiate legal action along with procedural and filing instructions. Previously, the Florida courts had held that the sale of such kits *per se* constituted the unauthorized practice of law. *See Florida Bar v. Peake*, 364 So.2d 431 (Fla.1978); and *Florida Bar v. Stupica*, 300 So.2d 683 (Fla.1974). However, the Florida Supreme Court reversed this position when it held, in *Florida Bar v. Brumbaugh*, 355 So.2d 1186, 1194 (Fla.1978), that non-attorneys

may sell printed materials purporting to explain legal practice and procedure to the public in general and ... may sell sample legal forms.... Further, ... it is not improper for [non-attorneys] ... to engage in a secretarial service, typing such forms for ... clients, provided that [the non-attorney] ... only copy the information given to [them] ... in writing by clients ...

*Id.* The court further held that the non-attorneys could not, however, advise clients as to the remedies available to them, assist them in preparing their court forms, nor ask

or answer questions of the clients as to which forms to fill out, how to fill them out, where to file the forms, and how to present their case in court. *Id.* *See also In re Calzadilla,* 151 B.R. 622 (Bankr.S.D.Fla.1993) (typing service can sell books or other printed material about bankruptcy law, but they cannot sell or hand out selective material from such books or publications as that would constitute legal advice which they are not qualified to give); and *Bachmann, supra* (secretarial service committed unauthorized practice of law because it advised and counseled debtors concerning bankruptcy law).

The majority of courts of other jurisdictions have held that the mere sale of forms with instructions does not constitute the unauthorized practice of law. *See State Bar v. Cramer,* 399 Mich. 116, 136, 249 N.W.2d 1, 9 (1976); *Oregon State Bar v. Gilchrist,* 272 Or. 552, 538 P.2d 913, 919 (1975); and *State v. Hill,* 223 Kan. 425, 573 P.2d 1078, 1079 (1978). However, these decisions have also consistently opined that, when the non-attorney also gives consultation and/or advice to the client regarding the legal process, where to file forms, or how to fill out the forms, this does constitute the unauthorized practice of law. *See Cramer, supra,* 399 Mich. at 137, 249 N.W.2d at 9; and *People v. Landlords Professional Services,* 215 Cal.App.3d 1599, 264 Cal.Rptr. 548 (1989).

As noted by the UST, the only court addressing the issue of the sale of the bankruptcy kits, as opposed to uncontested divorce kits, held that that activity, at least when the kit includes specific instructions, does constitute the unauthorized practice of law. In *Herren, supra,* the non-attorney defendant, for a fee of $240–$300, sold forms with instructions to persons wishing to file for bankruptcy. As is the case with the Center's method of operation, his customers would fill out the forms and then file their bankruptcy petitions *pro se.* Some of the information on the instruction sheets was incomplete or incorrect. For example, the instruction sheet did not tell the debtor that she could claim an exemption in her automobile. *Id.* at 992. The *Herren* court held that merely selling copies of the official bankruptcy forms and instructions to explain bankruptcy practice and procedure is permissible.

*Id.* at 994. Moreover, it also permitted typing of the bankruptcy forms with information provided by debtors. *Id.* However, the court determined that the defendant committed a violation of the unauthorized practice of law because his company "provided specific direction as to the correct way to fill out the forms, including what property to list where." *Id.* Moreover, the court also held that "providing clients with definitions of such legal terms of as 'creditors holding secured claims,' 'real property,' 'executory contracts,' and the like is, by itself, giving legal advice." *Id.* at 994–95. In addition, the court opined that "directing the client to 'refer' to what appears to be a comprehensive list of Wyoming exemptions from which the client is to select assets is, by itself, the unauthorized practice of law." *Id.* at 995. The instructions included in the packet entitled "Routine Bankruptcy Procedure" appeared to the court to advise debtors what they could expect in their own particular case, and did not just provide general information regarding the bankruptcy laws. *Id.* Thus, the court held that

> [a]dvising of available exemptions from which to chose, defining terms in the schedules, directing what property is appropriately listed in various areas, summarizing and reformulating the information solicited from clients, advising clients regarding responsibility to list all debts and the option of voluntary repayment and similar actions, all require exercise of legal judgment beyond the capacity and knowledge of lay persons.

*Id.* Consequently, the court held that the defendant committed the unauthorized practice of law and ordered that the entire fee charged to the debtor be disgorged. *Id.* at 996. *See also Akron Bar Ass'n v. Singleton,* 60 Ohio Misc.2d 19, 573 N.E.2d 1249 (1990) (sale of bankruptcy "dissolution kits," which a non-attorney filled out with his customers, constituted the unauthorized practice of law); and Annot., *supra,* 71 A.L.R.3d at 1005–07 (discusses cases which hold on each side of the issue of whether the sale of instructional kits, absent a personal meeting of the lay advocate and the customer, constitutes the unauthorized practice of law).

■ We are unable to state with certainty how the Pennsylvania state courts would rule on the issue of whether the sale of the requisite bankruptcy forms for filing the bankruptcy petition and schedules, along with instructions and definitions, would constitute the unauthorized practice of law. The majority rule in the context of sale of divorce kits appears to be that such conduct would not constitute the unauthorized practice of law. However, the Annot., citing *Yetter, supra,* places Pennsylvania within those jurisdictions holding that the sale of instructional kits, without more, constitutes the unauthorized practice of law.

Further supportive of the UST's position is the result in *Herren, supra,* the only bankruptcy kit case, which holds that the sale of a kit, without personal contact, constitutes the unauthorized practice of law. It is logical to distinguish the simple routine of an uncontested divorce from the maze of potential legal issues which can arise in a bankruptcy. Moreover, the materials described in *Herren,* 138 B.R. at 991–93, appear to have been far superior to the materials provided by the Center. The instant forms provide numerous specific instructions, several definitions, considerable advice (though frequently misguided) regarding, *inter alia,* exemptions, and thus gave advice regarding procedures which were seemingly as comprehensive as those at issue in *Herren,* although far more errors in the instant materials have been identified. *See* pages 438–442 *supra.* The Center's kit even supplies a sample form for adding creditors, which arguably goes beyond anything provided in the *Herren* materials. *See* page 441 *supra.*

At this point, it is appropriate to comment on the quality of Kramer's defense of the Center. First, we note that we provided a dispensation reserved to extraordinary circumstances in even allowing Kramer to represent the corporate respondent *pro se* before us. *See Rowland v. California Men's Colony,* 506 U.S. 194, 202 n. 5, 113 S.Ct. 716, 721 n. 5, 121 L.Ed.2d 656 (1993); *Simbraw, Inc. v. United States,* 367 F.2d 373 (3d Cir. 1966); and *In re Earle Industries, Inc.,* 67 B.R. 822, 823 (Bankr.E.D.Pa.1986). *But see United States v. Reeves,* 431 F.2d 1187, 1188 (9th Cir.1970); and *In re Holliday's Tax Services, Inc.,* 417 F.Supp. 182 (S.D.N.Y. 1976), *aff'd,* 614 F.2d 1287 (2d Cir.1979) (court may waive the counsel requirement in exceptional circumstances; criticized in *Rowland, supra*). We did so here partially as simply an accommodation to Kramer, and partially because allowing Kramer to serve as his own advocate provided a good means of testing the quality of the Center's advocacy in a "real-life" setting.

We conclude that Kramer failed this test. He continually levelled personal attacks at the UST and rendered several unnecessary disrespectful statements about lawyers and the legal profession generally. He misrepresented the result of *N.J. Bar, supra,* stating without qualification that it totally vindicated his position, when in fact the *N.J. Bar* court found that he *was* engaged in the unauthorized practice of law.

The argument that this federal court, considering the application of federal bankruptcy law and Pennsylvania unauthorized practice law, could possibly be bound by a New Jersey state court decision addressing divorce kits, was one that any lawyer, law student, or well-educated layman could immediately recognize as unpersuasive. Similarly, the due process argument has no merit. The Center and Kramer had over a month's notice of the hearing, an unusual dispensation because this court has discovered that lay advocates' activities must generally be investigated and heard very promptly, to minimize continuing harm to its victims.

In sum, Kramer's defense of his extremely poor quality product was a merger of form and content. The defense graphically proved to this court that Kramer's lawyer-bashing and failure to appreciate not only nuances but also concepts basic to bankruptcy law, combined with his self-deception that he has unusual powers and inclinations to de-mystify the bankruptcy process, render him and the Center as a public nuisance which are taking advantage of their customers' ignorance of both how easily and cheaply *pro se* bankruptcies can be filed on one hand, and how important competent legal advice for those not willing to take the chance of appearing *pro se* can be on the other hand.

We therefore find ourselves in a situation similar to that presented in *Evans, supra*. As in that case, the evidence could easily support the conclusion that the particular lay advocate is engaged in the unauthorized practice of law. 153 B.R. at 959. However, as in review of the facts in that case, we are even more impressed by the overwhelming evidence that the lay advocate in issue is grossly overcharging his customers, particularly when it is assumed that the services provided are in fact as limited and distanced from the practice of law as the particular lay advocate claims.

In *Evans*, assuming *arguendo* that respondent Legal Self Help, Inc. ("LSH") was merely collecting information, neatly typing, carefully filing its clients' bankruptcies, and referring them to a popular and detailed text to answer their legal questions, we held that LSH's services were worth no more than $100. 153 B.R. at 969–71.

In that case, however, LSH had successfully filed about 88 bankruptcy cases. This was evidence that LSH was doing its customers some good. Not only were no complaints of poor services provided by LSH before the court, but we could identify no specific deficiencies in quality of the work product.

Here, the work product purports to be more modest, and it certainly is. The Center takes no credit for any successful bankruptcy filings. Our assessment of its work product is that it is less than worthless. It provides false security to the Center's customers that the sparse information provided is accurate and sufficient to successfully file a Chapter 7 bankruptcy, or at the least that it will be helpful to customers in this endeavor.

We therefore conclude that the Center's bankruptcy work-product had no value to the Debtor and must be refunded. It is true that at least $12 to $14 worth of forms were provided. However, this value is offset by the detriment flowing from the Center's provision of outdated, erroneous, and misleading information to the Debtor. We conclude that the forms alone have some value. However, we conclude that this value is more than offset by the danger of damage created by the other documents.

An alternative basis for our conclusion that the Center must refund the $147.34 paid to it by the Debtor exists. F.R.B.P. 1006(b)(3) precludes the Center from retaining any compensation for its services prior to the Debtor's payment of the filing fee in full. *See In re Watson*, 1991 WL 269989, at *1 (Bankr.E.D.Pa. Dec. 12, 1991). Violation of this Rule was not in issue in *Evans, supra*, because there was no evidence that any of LSH's customers had paid their filing fees in installments. It is in issue here.

Consequently, we must order that the Center refund the entire $147.34 paid to the Center by the Debtor. We are also compelled to issue an injunction to prevent the Center and Kramer from continuing to market their bankruptcy kit. As in *Gavin, supra*, 181 B.R. at 825, it is appropriate to extend this injunction to all jurisdictions in which the Center does business, including New Jersey and New York. The inaccuracies included in the Center's bankruptcy kits, noted at pages 438–442 *supra*, affect potential debtors in New Jersey and New York in almost the same fashion as they do their Pennsylvania counterparts like the Debtor.

We should also note that we are not inclined to repeat what may have been a mistake on the part of the *N.J. Bar* court in suggesting that certain practices of the Center, if not their present manner of doing business, would be permissible. Any business which at any time promulgates a work-product as fraught with errors as the Center's kits in issue does not really deserve a chance to continue its business in any revised format. The instant order is intended to permanently enjoin all endeavors by the Center and Kramer in the bankruptcy field, even were they to promulgate an "improved" work-product. This is said to preclude Kramer from interpreting this decision as in any way supporting any of his business practices in the bankruptcy field in any form.

*D. CONCLUSION*

An order consistent with the conclusions reached in the foregoing Opinion will be entered.