**In re COMPUTER DYNAMICS INC., Debtor.**

**Computer Dynamics Inc., and Robert L. Starer, Movants,**

v.

**Stephen Gary Merrill, Respondent.**

No. 95–23127–A.

United States Bankruptcy Court,
E.D. Virginia,
Norfolk Division.

June 17, 1997.

Jerrold G. Weinberg, Weinberg & Stein, Norfolk, VA, Stephen G. Merrill, Ghent Law Offices, Norfolk, VA, Donna J. Hall, Mays & Valentine, L.L.P., Norfolk, VA, Alan D. Albert, Mays & Valentine, L.L.P., Norfolk, VA, Paul K. Campsen, Kaufman & Canoles, P.C., Norfolk, VA, Michael P. Cotter, Vandeventer Black LLP, Norfolk, VA, Robert B. Van Arsdale, Assistant U.S. Trustee, Office of the U.S. Trustee, Norfolk, VA.

## MEMORANDUM OPINION AND ORDER

DAVID H. ADAMS, Bankruptcy Judge.

We must now determine a difficult facet of this long and contentious case; i.e. did counsel for the creditors who sought the appointment of a trustee for the debtor violate Rule 9011 of the Federal Rules of Bankruptcy Procedure ("Rule 9011"). The Court has jurisdiction over the joint Motion for Sanctions ("Motion") filed by the debtor and Robert L. Starer ("Starer") pursuant to 28 U.S.C. §§ 1334, 157 and 11 U.S.C. § 105(a).

## PROCEDURAL HISTORY

We deem it appropriate and helpful to set forth the procedural history of these proceedings to provide a better understanding of the path thus far taken and the Court's analysis of the issues raised by the Motion. The Computer Dynamics, Inc. ("CDI") case began as an involuntary Chapter 11 proceeding with a petition filed on May 5, 1995, by Tweed's Locksmiths,

Inc, First Hospital Corporation of Portsmouth and Audio Fidelity Communications Corp. d/b/a The Whitlock Group. In response, on June 16, 1995, the debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code and requested that the involuntary petition be dismissed. By an agreement reached among the petitioning parties, the matter proceeded as a voluntary Chapter 11 case and the order of relief was entered on September 12, 1995.

Significantly, on November 22, 1995, a Motion to Appoint a Trustee ("Trustee Motion") was filed by Stephen Gary Merrill ("Merrill") on behalf of Phoenix Capital Inc. ("Phoenix"), First Hospital Corporation ("First Hospital"), The Whitlock Group ("Whitlock"), Norfolk Wire & Electric, Inc. ("Norfolk Wire"), and John Atkinson, Treasurer of the City of Virginia Beach ("Atkinson") as the moving creditors. Starer, as the designated representative of the debtor, intervened in the Trustee Motion without opposition on November 29, 1995. After a motion to strike certain of the allegations was granted by the Court at a preliminary hearing held on January 24, 1996, the moving creditors filed an Amended Motion to Appoint a Trustee ("Amended Trustee Motion") a week later. An inordinate amount of discovery was conducted by the parties, and the trial of the issues raised in the Amended Trustee Motion was conducted over a period of seven days, concluding on March 8, 1996, at which time the Court denied the Amended Trustee Motion.

On April 17, 1996, the debtor and Starer filed the joint Motion under Rule 9011 seeking sanctions against Merrill and the moving creditors. We deal here with the issue of sanctions as it relates to Merrill.

## FACTUAL BACKGROUND

Merrill testified that he held himself out to the public as a bankruptcy practitioner and that he is comfortable in this Court doing a good job for his creditor and debtor clients. He indicated that he was familiar with the Bankruptcy Code and with Sections 1104 and 1112 in particular, relative to seeking the appointment of a trustee in Chapter 11 and to the conversion or dismissal of a Chapter 11 case. He also testified that he understands and always complies with Bankruptcy Rule 9011.

Prior to filing the Motion in November, 1995 Merrill talked extensively with Alan Fuentes ("Fuentes"), the former owner and CEO of the debtor. Merrill met Fuentes in 1994, and they became good friends shortly thereafter. Later, Fuentes hired Merrill to assist him with his personal bankruptcy and to pursue CDI after a trustee was appointed for Fuentes in his Chapter 11 proceedings, resulting in Fuentes' loss of control of his own assets, including his claim to ownership in CDI and his claim against Starer. Their early discussions related to filing an involuntary petition against CDI, but in the Fall of 1995, those discussions turned to the filing of the Motion. Merrill described Fuentes as Merrill's "chief investigator"; he sent Fuentes out to find witnesses and then Merrill interviewed them to determine the facts they had knowledge of in order to support the drafting and filing of the Motion. As a result, Merrill interviewed several former employees of the debtor to determine the internal operations of CDI after the departure of Fuentes from the debtor. Merrill did not talk to any member of the board of directors of CDI and he did not review any minutes of the meetings of the board of directors. He did not review the transcript of the Rule 2004 examination of Starer taken by counsel for the debtor, only the exhibits introduced during the examination. Merrill admitted that he speculated on what happened in the operation of the debtor principally from what former employees told him prior to drafting the Motion.

Merrill did not talk to the petitioning creditors to obtain facts to establish the allegations contained in the Motion. He relied on Fuentes to recruit the creditors to petition for a trustee and Merrill felt that he needed several petitioning credi-

tors to join in the Motion in order to lend credibility to his cause. He did not talk to any CDI lender prior to filing the Motion, yet he talked at length several times with the investigator from Chicago, Hiam Zitman, hired by Phoenix Capital Corporation to discover "dirt" on and the financial condition of Starer.

Merrill felt it was critical to have several petitioning creditors in order to lend credibility to the Motion, so he sent Fuentes out to round up creditors who would agree to be petitioners for a trustee in order to oust Starer from operational control of the debtor. Creditors were solicited by Fuentes and told by Merrill that the appointment of a trustee was the only means by which they would have any hope of recovering any of the money due them from the debtor. They recruited six cooperative creditors, but only five would allow their names to be used as petitioners. Of the five original petitioning creditors, Phoenix, First Hospital, Atkinson, Norfolk Wire and Whitlock, Merrill only spoke with representatives of those creditors, if at all, after the Motion was drafted and filed.

In preparation for the drafting of the Motion, Merrill interviewed twelve people who supplied him with information upon which he based the allegations detailed in the pleading he signed on behalf of the moving parties. In addition, Merrill reviewed documents provided to him by the witnesses, consisting primarily of internal operating reports, correspondence and papers, and he reviewed the bankruptcy petition filed by the debtor, as well as talking to counsel who prepared the involuntary petition for the creditors who put CDI in bankruptcy. Merrill also reviewed the testimony given by Starer and an accountant

at Fuentes' personal Chapter 11 plan confirmation hearing. From these sources and the information provided and from other research, Merrill drew his own conclusions and formulated the allegations set forth in the Motion.[1]

After some of the allegations in the Motion were removed by the granting of a partial motion for summary judgment, Merrill set about to draft the Amended Motion. Prior to drafting it, Merrill personally interviewed nine witnesses and reviewed the 69 exhibits to the Starer Rule 2004 examination. Merrill also spent four hours reviewing 1500 boxes of the debtor's documents in storage and took Starer's deposition over a two day period. Again, Merrill drew certain conclusions from the information learned through his investigation and expanded on most of the allegations originally contained in the Motion when he drafted the Amended Motion, exclusive of the allegations stricken by the Court.

Merrill stated that he had no knowledge that any allegations made in the Motion or the Amended Motion were false, and he admitted that he needed to complete a significant amount of discovery after filing the original pleading in order to obtain the evidence to prove the allegations he made in the Motion. He acknowledged that he set forth conclusions rather than facts in the Motion and the Amended Motion.

## CONCLUSIONS OF LAW

■ Federal Rule of Bankruptcy Procedure 9011 parallels former Federal Rule of Civil Procedure 11 and courts accordingly apply the same standard in interpreting cases under Bankruptcy Rule 11 as in cases involving Federal Rule 11.[2] *In re*

---

1. We have not tried to recite every investigatory act taken by Merrill prior to the filing of the subject motions relating to the request for the appointment of a trustee, but have set forth in general some of the most significant steps taken by counsel to gather information in support of the allegations contained in the Motion and the Amended Motion.

2. Federal Rule of Civil Procedure 11 was amended effective December 31, 1993 but Federal Rule of Bankruptcy Procedure 9011 was not accordingly amended. Therefore, cases interpreting former Rule 11 apply in situations involving Rule 9011. See *In re Atlas Machine & Iron Works, Inc.*, 190 B.R. 796, 806 (Bankr.E.D.Va.1995).

*Atlas Machine And Iron Works, Inc.,* 190 B.R. 796, 806 (Bankr.E.D.Va.1995). The actual language of Rule 9011 is critical to a proper understanding of this case. The Rule provides:

(a) SIGNATURE. Every petition, pleading, motion and other paper served or filed in a case under the Code on behalf of a party represented by an attorney, except a list, schedule, or statement, or amendments thereto, shall be signed by at least one attorney of record in the attorney's individual name, whose office address and telephone number shall be stated. A party who is not represented by an attorney shall sign all papers and state the party's address and telephone number. *The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose,* such as to harass, or to cause unnecessary delay, or needless increase in the cost of litigation or administration of the case. If a document is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the person whose signature is required. *If a document is signed in violation of this rule, the court on motion or on its own initiative, shall impose on the person who signed it, the represented party, or both, an appropriate sanction,* which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including a reasonable attorney's fee. (Emphasis added).

■■■ The act of signing the pleading is when the violation of the Rule occurs.

Each person signing a document has a "personal, non-delegable responsibility" to investigate the truth and legal basis of the paper filed. *Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 126, 110 S.Ct. 456, 460, 107 L.Ed.2d 438 (1989).

■■■ The Court should look to the plain meaning of Rule 9011 and not go beyond the plain language of the Rule if it is clear and unambiguous. *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* 498 U.S. 533, 540–541, 111 S.Ct. 922, 928, 112 L.Ed.2d 1140 (1991). The plain meaning of the Rule places the responsibility for investigating the factual and legal basis for a pleading on the person who actually *signs* the pleading. The normal attorney-client relationship is comprised of a client having some facts and seeking the advice of an attorney. If the attorney files a pleading, it is incumbent upon him to verify the facts communicated to him by the represented party and to investigate the "case" further on his own initiative. In the case *sub judice,* the represented parties were relying exclusively on the attorney to gather the facts and certainly to make the legal determinations of whether cause existed factually and legally to appoint a trustee for CDI under the circumstances prevailing at the time.

■■■ Exactly what types of papers are covered by the Rule is also an important threshold matter in this case. Obviously, the original Motion and the Amended Motion are within the scope of the Rule and this decision focuses upon those two pleadings. The Fourth Circuit has clearly stated that the proper test of whether a violation of the Rule has occurred is a "snap shot" of the circumstances at the time the relevant pleading is signed by the attorney. *Brubaker v. Richmond,* 943 F.2d at 1363, 1381–1382 (4th Cir.1991). Under the Rule, counsel may not have a continuing duty to reevaluate the merits of the case as plead and to dismiss it if it is discovered that it lacks merit. If that were the case, then the Rule would be the basis for sanc-

tions for *failure to file* certain papers. *Id.* at 1381. See also *Simpson v. Welch*, 900 F.2d 33, 36–37 (4th Cir.1990) (Rule 11 is improper vehicle for court to impose sanctions for conduct during the course of the lawsuit; the rule only covers conduct related to the signing of pleadings, motions, or other papers and does not cover failure to file certain pleadings or papers). The Court in *Brubaker* did point out that the "snapshot" view does not mean that a party does not have to reevaluate its case because many papers are filed in the course of litigation and the each paper filed must have merit in order to avoid sanctions.[3] *Brubaker*, 943 F.2d at 1382 n. 24. Therefore, for our purposes, the relevant time frames to consider are at the time of the filing of the original Motion on November 22, 1995 and when the Amended Motion was filed on January 30, 1996.

■ The Supreme Court has made it clear that an **objective standard** of reasonable inquiry is to be imposed on anyone signing a pleading or other paper. *Business Guides*, 498 U.S. at 554, 111 S.Ct. at 934–935. The benchmark Fourth Circuit opinion on all facets of Rule 11 of the Federal Rules of Civil Procedure is *In re Kunstler*, 914 F.2d 505 (4th Cir.1990). The Court of Appeals upheld the determination of the district court that the conduct of the lawyers involved in that case merited sanctioning, but remanded the case to the district court for a determination of the proper amount of sanctions. The pertinent portion of the *Kunstler* opinion to our inquiry is that dealing with the analysis relative to improper purpose.

■ The second prong of the Rule creates the necessity of evaluating whether the pleadings filed were interposed for an improper purpose. The Rule sets forth a non-exclusive list of improper purposes, such as harassment, to cause unnecessary delay or to needlessly increase the cost of litigation. The enumerated improprieties are examples only of the type of conduct proscribed by the Rule. In *Kunstler*, the 4th Circuit specifically did not decide if a complaint well grounded in law and in fact can be sanctioned solely on the basis of the improper purpose for the filing. We think that a determination that a complaint, well grounded in law and well grounded in fact, interposed for an improper purpose can result in Rule 9011 sanctions. We are also mindful of the suggestion of the Fourth Circuit that any inquiry into improper purpose should first involve an analysis of the first two prongs of the Rule 11 consideration, i.e. whether the pleading was well grounded in fact and in the law.

■ In viewing the purpose for which a pleading was filed, the court must apply an objective standard of reasonableness. The 4th Circuit in *Kunstler* held:

Rule 11 defines the term "improper purpose" to include factors 'such as to harass or to cause unnecessary delay or needless increase in the costs of litigation.' The factors are not exclusive. If a complaint is not filed to vindicate rights in court, its purpose must be improper. However, if a complaint is filed to vindicate rights in court, and also for some other purpose, a court should not sanction counsel for an intention that the court does not approve, so long as the added purpose is not under-taken in bad faith and is not so excessive as to eliminate a proper purpose. Thus, the purpose to vindicate rights in court must be central and sincere. . . . In other words, it is not enough that the injured party subjectively believes that a law-suit was brought to harass, or to focus negative publicity on the injured party; instead, such improper purposes must be derived

---

**3.** *Fahrenz v. Meadow Farm Partnership*, 850 F.2d 207 (4th Cir.1988) would seem to suggest that there is a continuing obligation to dismiss a case if it is found to be without merit. However, the Fourth Circuit in *Brubaker* noted that the court in *Meadow Farm*

was not confronted with the issue of the time period for which expenses were awarded, and therefore the court could not say that the earlier decision attempted to impose a continuing duty on parties to dismiss a case. *Brubaker*, 943 F.2d at 1381–82 n. 23.

from the motive of the signer in pursuing the suit. . . . evidence may be said to be 'objective' in the sense that it can be viewed by a court without fear of misinterpretation; it does not involve difficult determinations of credibility. Circumstantial facts surrounding the filing may also be considered as evidence of the signer's purpose.

*Kunstler*, at pages 518–519.

We must now analyze the Motion and the Amended Motion in light of the surrounding circumstances to evaluate whether the pleadings were well grounded in fact and existing law and whether they were filed for an improper purpose.

The Motion and the Amended Motion were filed pursuant to 11 U.S.C. § 1104 which gives the Court the power to appoint a trustee for a Chapter 11 debtor ". . . for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case . . . ." **Importantly, at the time that the bankruptcy petition and the Motion were filed the debtor was not conducting any business and had no employees.** Merrill has never given a plausible reason for not filing a motion to convert this case to one under Chapter 7, pursuant to § 1112(b).

This case has involved a crusade to discredit Starer and divest him of any authority over the debtor. The crusade was initiated by Fuentes and the sword was passed on to Merrill in order to further the purpose of the cause *celebre*. Fuentes was outraged that Starer ended up with ownership and control of CDI and thereafter acquired the worthwhile operating divisions of the debtor. Fuentes took his crusade to get his company back from Starer to Merrill, who adopted Fuentes' cause *celebre* as his own. Long before the Motion was filed, one could not distinguish Merrill from the Fuentes banner which he flaunted. Merrill attended a meeting of former CDI employees and Fuentes, also attended by a newspaper reporter, months

before preparing the Motion during which the future course of the war against Starer was mapped out. Thereafter, Merrill and Fuentes set about getting support for their attacks on Starer, with Merrill becoming the primary standard bearer for the campaign. His leadership of the personal attacks on Starer is clearly evident from his opening statement to the Court at the hearing on the Amended Motion.

 In so doing, Merrill violated Canon Five, and Disciplinary Rules 5–101, 5–105 and 5–106 of the Code of Professional Responsibility which require, *inter alia*, a lawyer to exercise independent professional judgment. The proscription of Canon Five is the acceptance of employment where the exercise of independent professional judgment may be affected by the attorney's own personal or financial interests, or his judgment may be improperly influenced by others than his client. Disciplinary Rule 5–101(A) provides:

(A) A lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client may be affected by his own financial, business, property, or personal interests, except with the consent of his client after full and adequate disclosure under the circumstances.

Disciplinary Rule 1–105(A) mandates:

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of his client will be or is likely to be adversely affected by the acceptance of the proffered employment . . .

And, Disciplinary Rule 1–106(B) proscribes:

(B) A lawyer shall not permit a person who recommends, employs, or pays him to render legal services for another to direct or regulate his professional judgment in rendering such legal services.

Merrill ostensibly represented the petitioning creditors, all of whom were recruited by Fuentes and only one of whom paid him anything for the legal services rendered, who had no direct knowledge of the allegations made in the pleadings. Was Merrill looking out for the best interests of the petitioning creditors by drafting and filing the Motion and the Amended Motion? We think not. He was crusading for Fuentes and created a cause *celebre* on behalf of someone other than his clients; otherwise, why would he have created such inflammatory, subjective and outrageous allegations when simple, objective ones would have served the purpose? As we will demonstrate, Merrill assumed a personal interest in the litigation beyond the realm of propriety and lost all objectivity in the pursuit of the Motion and the Amended Motion.

Paragraph (1) of the Motion asserts that Starer, as "the person presently acting as the debtor-in-possession (sic) for the debtor" committed acts of corporate malfeasance which demonstrate that he had been "ransacking" the company and, *inter alia*, paid lavish personal expenses while refusing to pay employee withholding taxes and employee health insurance premiums. Merrill based those allegations on information imparted by former employees, who at trial did not support the allegations made of gross mismanagement by Starer. It is true that certain divisions of CDI were foreclosed upon by third party lenders and Starer, or one of his companies, bought their operations by assuming large amounts of debt related to the separate divisions. Plausible explanations were given by several witnesses to refute the other allegations of mismanagement alleged in this paragraph, which prevented a finding of gross mismanagement by Starer. Count (1) of the Amended Motion embellished the allegations in the Motion to include charges that Starer either did not keep or disposed of corporate records in

order to hide his self-dealing with the debtor's assets. The latter inference alluded to by Merrill was authored after Merrill was aware that a warehouse full of documents of CDI existed, but which had not been thoroughly reviewed by him prior to creating the Amended Motion.

Count (2) of the Motion and the Amended Motion use the phrase "alleged pathetic state", while Count (3) of Motion alludes to criminal acts with phrases such as "willfully stealing", "defrauding the United States", "credit application fraud", "defrauding his fellow directors" and "tormenting female CDI employees for sexual favors" [4]. That Count of the Amended Motion again embellishes on the innuendo of the Motion by alleging that Starer impeded an audit of CDI to cover up the true financial condition of the debtor, thereby contradicting the moving creditors' theory of the great value of the debtor and that Starer maintained an elaborate check kiting scheme.

Count (4) of the Motion and Count (5) of the Amended Motion are identical and are not offensive, but Count (4) of the Amended Motion raises the specter of a crisis manufactured by Starer in order to steal a profitable division of CDI.

None of the cited allegations, inferences and innuendo improperly drawn from statements made by former employees of the debtor was necessary to or appropriate for the motion to have the Court appoint a trustee for the dormant debtor.

 We must look to the purpose, objectively and subjectively, for filing the *Motion* and the *Amended Motion* within the context of the case, the debtor's situation, and the content of the pleadings themselves. *In re Kunstler*, 914 F.2d 505 (4th Cir.1990) is particularly instructive for the case *sub judice*. In *Kunstler*, the respondents' clients were acquitted of feder-

---

4. The allegations relative to sexual improprieties of Starer were not included in the Amended Motion due to the Court's granting of partial summary judgment in favor of Starer relative to the irrelevance of those allegations.

al criminal charges arising from their armed takeover of a newspaper office in Robeson County, North Carolina. When the state announced it was considering indicting the two individuals for the takeover, one of the two began a petition drive seeking to have two members of the Robeson Sheriff's Office removed from their positions. Later the two activists were indicted by the State of North Carolina and their counsel felt that there had been constitutional violations in the handling of their criminal case, which could only be resolved by a civil suit against the public officials responsible for the indictment. The civil suit was filed on the one-year anniversary of the newspaper office takeover and was the subject of a press conference called by one of the attorneys for the plaintiffs. The Fourth Circuit found violations of Rule 11 in *Kunstler:*

> In this case, the complaint was filled with irrelevant allegations not tied to specific injuries to plaintiffs, i.e., general allegations of abusive behavior against blacks and Indians, and allegations that Robeson County is beleaguered by poverty, illiteracy, and violence.... (At page 515)

> In concluding that appellants had never intended to litigate their suit, the district court also concluded that circumstances surrounding the case, when viewed as a whole, supported the conclusion that appellants' primary motives in filing the complaint were to gain publicity, to embarrass state and county officials, to gain leverage in criminal proceedings, and to intimidate those involved in the prosecution of Hatcher and Jacobs....

> Holding a press conference to announce a lawsuit, while perhaps in poor taste, is not grounds for a Rule 11 sanction, nor is the subjective hope by a plaintiff that a lawsuit will embarrass or up-set a defendant, so long as there is evidence that a plaintiff's central purpose in filing a complaint was to vindicate rights through the judicial process. In this

case, however, there was no proper purpose for appellants' filing of the suit, and the district court's consideration of other possible motives for the suit based on the evidence available was proper. (At page 520).

In *In re Gary,* 38 B.R. 675 (Bkrtcy. D.Md.1984) the Bankruptcy Court determined that the filing of a petition merely for the purpose of gaining leverage to force a secured creditor to execute a forbearance agreement was improper. An improper collateral attack on a bankruptcy court order was held to be sanctionable by the Ninth Circuit Court of Appeals in *Valley National Bank of Arizona v. Needler (In re Grantham Brothers),* 922 F.2d 1438 (9th Cir.1991).

In *Harrison v. Edison Bros. Apparel Stores, Inc.,* 146 F.R.D. 142, 145 (M.D.N.C. 1993), the plaintiff's attorney was sanctioned for filing a motion to disqualify opposing counsel, which was filed for an improper purpose. Former counsel for a party earlier dismissed from the suit made an appearance as co-counsel for the remaining corporate defendant, and almost two years after the appearance of the co-counsel and two weeks before the trial, the attorney for the plaintiff moved the court to disqualify the co-counsel from representing the corporation. The court found that the late filed motion was interposed for the purpose of interrupting the opposing counsels' trial preparation and to increase litigation expenses. Because the court *found no valid reason why the motion to disqualify was filed so late,* it held the filing of the motion to be sanctionable. This objective standard of a valid reason for the filing of a pleading is persuasive. In *Matter of King,* 83 B.R. 843 (Bkrtcy. M.D.Ga.1988), the court found that the filing of a Chapter 11 petition simply to forestall a state court action with no intention to effectuate a reorganization is a sanctionable act.

The court in *In re Thomason,* 161 B.R. 281 (Bkrtcy.N.D.Fla.1993), points out that Rule 9011 sanctions are to deter and pun-

ish those parties responsible for filing actions without merit which result in needless litigation expense. In an exhaustive opinion, the Bankruptcy Court in Minnesota determined, among many other conclusions drawn, that the "improper purpose" test of Rule 9011 requires the balancing of two dynamics: limiting harassment, delay and expense without impeding zealous advocacy. *In re KTMA Acquisition Corp.*, 153 B.R. 238 (Bkrtcy.D.Minn.1993). That court recognized the standards in evaluating whether a pleading is filed for an improper purpose: "While the improper purpose prong of Rule 9011 embodies the subjective component of the rule, the signer's conduct is judged objectively looking at the facts of the case, the reasonableness of the pleading and the *circumstances of the filing. See In re Kunstler,* 914 F.2d 505, 518–520 (4th Cir.1990) ...." *KTMA* at page 265. The *KTMA* court found that at least one of the pleadings was filed for the purpose of harassment, and the fact that a reasonable pre-filing investigation was made and/or that the pleading was supported by the law and the facts will not save the signer from sanctions if the pleading was interposed for an improper purpose.

We believe that a pleading well grounded in fact and in law may be the subject of a sanction because it was filed for an improper purpose. The motion for the appointment of a trustee in this case was permissibly grounded in fact and in law. The debtor was not operating any business at the time of the commencement of the Chapter 11, had no employees and objectively had no real likelihood of rehabilitation. In addition, it was owned and headed up by an individual who had purchased the assets of the debtor under circumstances which certainly merited the scrutiny he would not afford the creditors as the designated representative of CDI. The reasons for the appointment of a trustee existed, but the Motion and the Amended Motion exceeded the bounds of objective reason, and therefore permit the

Court to conclude that they were interposed for an improper purpose; i.e. not merely for the appointment of an independent trustee. They are so irresponsibly drafted and inflammatory, that they exceed the single purpose of having a trustee appointed for CDI. In fact, Merill could not persuasively articulate the rights intended to be vindicated in court by the filing of the Motion and the Amended Motion.

The ousted owner of CDI, who admittedly had a vendetta against Starer and was involved in a crusade to regain control of the debtor, not just to see that the creditors were protected, was represented by counsel for the creditors moving for the appointment of a trustee. Fuentes and Merrill were familiar with the appointment of a trustee in a Chapter 11 proceeding, because one had been appointed by the Court in Fuentes' Chapter 11 case. Merrill represented Fuentes in his Chapter 11 case. Fuentes' crusade became Merrill's, which was evident from the inflammatory allegations against Starer, the content of the Amended Motion after the Court granted the motion to strike the references in the Motion to sexual harassment which had no bearing on the Motion under the circumstances extant for the debtor, the demeanor of Merrill in arguing the Amended Motion and his demeanor as a witness in the sanctions hearing.

A simple recitation of the facts that the debtor was out of business, had no employees, had no ready assets with which to reorganize, had suffered the loss of its divisions seemingly in favor of its majority shareholder, the designated representative before the Bankruptcy Court, and had no disinterested leadership to investigate the prepetition affairs of the debtor would have sufficed under 11 U.S.C. §§ 1104 or 1112. Those facts would certainly have supported relief under the standard of "cause" set out in § 1104(a)(1) and in § 1112(b)(1), (2) and (3). Instead, Merrill included in the motions irrelevant allegations not tied to the necessity for the

appointment of a trustee, e.g. general allegations of sexual harassment. Viewing the circumstances of the debtor and the Chapter 11 case as a whole, Merill's motive in structuring the pleadings the way he did was not for the main purpose of getting a trustee appointed, but was obviously intended to harass, intimidate, and embarrass Starer and to substantially increase the cost of the litigation involving the defense of the motion for a trustee. The pleadings were certainly crafted to further the crusade of Fuentes and Merrill against Starer. The fact that the filing of the Motion was so flamboyantly publicized in the local newspaper further justifies the Court's conclusions of the improper purposes for which the pleadings were filed. The publicity alone is not conclusive, but taken in the context of the entire circumstances surrounding the case, the notoriety gained for the crusade allows the Court to consider the improper motives for the drafting of the offending pleadings by Merrill. See *Kunstler, supra.*

It became evident at the hearing on the Motion that Merrill had conducted, in some instances and failed to conduct in others, discovery with the intent to harass Starer and the debtor and also with the intent to needlessly increase the cost of the litigation. Merrill, in response to discovery requests, listed witnesses in several states possessing facts to support the allegations in the Amended Motion, but with whom he had had no contact. Merrill also chose not to attend several depositions of individuals he listed as potential witnesses, which is an indication that Merrill thought those witnesses possessed facts which were not important to his case. At those depositions, it became apparent to the counsel in attendance that the deponents could not support the allegations of Merrill and most had not talked to him.

In addition, Merrill never reviewed the Starer Rule 2004 examination transcript, and when he did take Starer's deposition, it is uncontroverted that Merrill never inquired into the facts alleged in the Motion and the Amended Motion, or into Starer's management of the debtor at all. Merrill had been given access to the CDI files in a warehouse, and yet in the Amended Motion drafted thereafter, he alleged that Starer had destroyed essentially all of the records of the debtor. What legitimate purpose could there be to make such an allegation after visiting the warehouse?

A review of the record of the sanctions hearing will reveal that Merrill continued his crusade up through that time. His answers to questions, on both direct and cross examination, were very pejorative towards Starer. There was certainly no justification for Merrill's ongoing derisive attitude toward Starer so long after the pursuit of a trustee for CDI had failed, but for Merrill's vituperative and improper motive in filing the Motion and Amended Motion. It has long been established that the bankruptcy court is the judge of the credibility of the witnesses at a hearing. The bankruptcy judge is best suited to observe the credibility, candor, demeanor and truthfulness of the witnesses presented at the hearing. *In re St. Clair,* 193 B.R. 783 (Bankr.W.D.Va.1996); *Farouki v. Emirates Bank Intl., Ltd.,* 14 F.3d 244 (4th Cir.1994). Hence, we found Merrill's demeanor and candor to be unusually and unnecessarily offensive. The manner in which he delivered his testimony in Court supports our conclusion that Merrill filed the Motion and the Amended Motion to harass and embarrass Starer.

We find that Canons 5, 6 and 7 of the Code of Professional Responsibility are particularly applicable to the case, *sub judice,* in that Merrill violated the latter two Canons by his conduct. A lawyer must represent his clients zealously and within the bounds of the law, but he must do so in a manner that does not violate the Disciplinary Rules, which are mandatory minimum standards of conduct, as required by Local Rule 2090–1(I).

A lawyer must absolutely exercise **independent professional judgment,**

which Merrill completely ignored in bringing the Motion and the Amended Motion and wording both of them in the manner that he did. It is not mere coincidence that a trustee had been appointed for Fuentes in his Chapter 11 case, and as previously pointed out, Merrill inappropriately adopted the Fuentes crusade as his cause *celebre*, which is proscribed by Canons 5 and 7. Merrill ostensibly represented the interests of the creditors with whom he did not confer prior to the preparation of the pleadings in issue. In fact, it became apparent at the trial that none of Merrill's "clients" knew anything at all about the allegations attributed to them in the Motion and the Amended Motion. That lack of knowledge was pungently made plain to Merrill when two of the original five moving creditors withdrew from the action when they read about "their" allegations in the newspaper after the initial pleading was filed. As is proscribed by Disciplinary Rules 5–101(A) and 5–106(B):

> A lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client may be affected by his own financial, business, property, **or personal interests**, except with the consent of his client after full and adequate disclosure under the circumstances. (Emphasis added).

> A lawyer shall not permit a person who recommends, employs, or pays him to render legal services for another to direct or regulate his professional judgment in rendering such legal services.

Merrill violated the letter and the spirit of the cited Disciplinary Rule ("DR"). He did not discuss the clients needs, the case or the facts known to the clients prior to filing the Motion. In Addition, Fuentes recruited all of the petitioning creditors for Merrill to represent, and none of them had any professional relationship with Merrill before, during or after the subject motions were filed and prosecuted to an unsuccessful end. Ethical Consideration ("EC") 5–1 is instructive under the circumstances created by Merrill's total disregard for proper professional conduct:

> The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and **free of compromising influences and loyalties.** Neither his personal interests, the interests of other clients, **nor the desires of third persons should be permitted to dilute his loyalty to his client.** (Emphasis added).

As previously stated, this case was about a crusade against Starer, nothing more and nothing less. EC 7–14 is also "directly on point:" The obligation of loyalty to his client applies only to a lawyer in the discharge of his professional duties and **implies no obligation to adopt a personal viewpoint favorable to the interests or desires of his client.** (Emphasis added). Merrill's loyalty in the pursuit of a trustee for CDI, extremely misplaced, was to Fuentes and not to the petitioning creditors as it should have been properly lodged.

■ Merrill also violated DR 7–101(A)(3) which provides that: "A lawyer shall not intentionally: ... [p]rejudice or damage his client during the course of the professional relationship...." We have already determined in a separate phase of the case that, due to the actions of Phoenix, a Merrill client and petitioning creditor, as a result of his advice to Phoenix it violated Rule 9011 and was therefore the object of an award of sanctions for such conduct. Amazingly, Merrill's advice to Phoenix was so suspect from the outset that the client demanded and received from Merrill an indemnity agreement relative to its continued participation in the case, after its representative was made aware of the allegations Merrill made on its behalf. That hold harmless guaranty given by Merrill to his client also violated DR 5–103 and DR 5–105, which prohibit a lawyer from acquiring a proprietary interest in the subject matter of the litigation he is conducting on behalf of a client and from accepting employment when doing so

would adversely affect the exercise of his independent professional judgment. Merrill certainly assumed a direct financial interest in the outcome of the Amended Motion when he agreed to protect Phoenix from any losses as a result of its participation in the crusade against Starer. This is a simple example of why Merrill was totally incapable of exercising independent judgment in his oppressive desire to discredit, harass and embarrass Starer.

The conduct of Merrill's cause *celebre* against Starer by an attorney proclaiming to be proficient in bankruptcy litigation also violated DR 7–102(A)(1) and (8):

> "In his representation of a client, a lawyer shall not:
>
> (1) File a suit, . . . assert a position, . . . or take other action on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another. . . ."

Merrill initiated the course he chose without a proper purpose. He sought the appointment of a trustee by making outlandish and extraneous allegations against Starer as the designated representative of a defunct debtor, as opposed to the obvious and unoffensive move to convert the CDI case to one under Chapter 7 of the Bankruptcy Code. Such a motion would have been almost indefensible and would have most likely resulted in the immediate appointment of a trustee. There is no rational reason why Merrill filed the Motion and the Amended Motion. There can be no other conclusion drawn from Merrill's course of improper conduct. As Merrill himself said from the witness stand, the filing of the Motion and the Amended Motion ". . . was the dumbest thing I have ever done." Enough said!

 Merrill's improper conduct is so egregious that it deserves serious sanctioning by this Court. A violation of the Virginia Code of Professional Responsibility by an attorney improperly signing pleadings filed with this Court is sanctionable misconduct. The federal courts may and should hold attorneys appearing before them to recognized standards of conduct in their jurisdictions: "The sanctioning court must, however, hold attorneys accountable to recognized standards of professional conduct." *In re Finkelstein,* 901 F.2d 1560, 1564 (11th Cir.1990). See also *In re Snyder,* 472 U.S. 634, 645, n. 6, 105 S.Ct. 2874, 86 L.Ed.2d 504 (1985), and *In re Palumbo Family Ltd. Partnership,* 182 B.R. 447 (Bkrtcy.E.D.Va.1995). Violations of the Code of Professional Responsibility may lead to severe sanctions, from the imposition of monetary penalties to the suspension of an offending lawyer's right to practice law before the court. *In re Hessinger & Associates,* 171 B.R. 366 (Bkrtcy.N.D.Cal.1994), aff'd in pertinent part 192 B.R. 211 (N.D.Cal.1996).

Having decided that Merrill's actions violated Rule 9011, the Court conducted a hearing to determine the proper sanctions to be imposed against Merrill. The Court has heard extensive evidence concerning the damages alleged by the debtor and Starer, as well as evidence concerning Merrill's ability to pay any sanctions awarded in this case. Counsel for the debtor and Starer agreed at the hearing to limit their request for reimbursement of attorneys fees, as one element to be considered by the Court, to $10,500.00 each, representing actually less than the fees earned relative to the attendance of the Starer deposition taken by Merrill and their appearance at the seven days of trial on the Amended Motion. Merrill's financial evidence tended to indicate and his counsel argued that he is substantially insolvent at this time, allegedly due to his participation in this case. However, on cross examination, Merrill admitted that his listed expenses were not actually being incurred at the present time and several potentially significant assets had been either undervalued or completely left off of his balance sheet! For example, Merrill listed potential expenses were he to move to his farm in Isle of Wight County, Virginia, and he included no value for his law

practice, his firm's accounts receivable or his legal work in progress.

 This Court adopts the standard set forth in *Kunstler,* citing *White v. General Motors Corp.,* 908 F.2d 675 (10th Cir. 1990):

> A district court should consider the four factors ... (1) the reasonableness of the opposing party's attorney's fees; (2) the minimum to deter; (3) the ability to pay; and (4) factors related to the severity of the Rule 11 violation.

 The movants have voluntarily reduced their legal fee claims to the realm of reason. The actual fees allegedly attributable to the defense of the Motion and the Amended Motion approximate $350,000 between counsel for the debtor and Starer. The movants reduced the legal fees for consideration to $21,000 or $10,500 each, which we find to be reasonable under all of the circumstances of this case. They seek consideration of only those fees to attend the Starer deposition and the seven day trial, and have reduced the fees charged for those attendances to the figures stated. However, as the court in *Kunstler* points out, sanctions are not to be utilized primarily as a means for fee shifting.

We have addressed Merrill's ability to pay. While his present ability may be very limited, the Court considers that his future is promising and evidences an ensuing ability to pay. He admitted on the stand that he would find a way to pay any sanction the Court might impose. We have also concluded in the foregoing pages that the violation of Rule 9011 by Merrill is severe. The filing of the Motion and the Amended Motion were gross violations of Rule 9011, and they caused substantial harassment and increased expense in ad-

ministering the affairs of the debtor and involved countless hours of the Court's and its staff's time and energy.

 The determination of the minimum sanction to deter is the most vexing to the Court. While it is recognized that the debtor and Starer were the principal victims of Merrill's impropriety, the Court is an equally harmed victim. The objective of deterrence relates to the Court as well as the litigants.[5] While Merrill admitted that his crusade was the dumbest thing he ever did, his defense of the Motion for Sanctions did not clearly indicate that he is conscious of the wrong he perpetrated and the damage done to all directly concerned. As argued by the movants, Merrill did not seem to "get the message" of the Motion for Sanctions. Even though there is minimal evidence that Merrill is cognizant of the error of his ways in this situation, something more is needed to deter any further such misguided and unprofessional efforts on his part.

 Taking into account the evidence presented at a full day's hearing the Court concludes that the imposition of the following sanctions is merited and proper. Merrill's obvious and extremely serious violations of the Virginia Code of Professional Responsibility and Bankruptcy Rule 9011 cause this Court grave concern about his fitness to practice law and to do so within the confines of those standards. For his offending behavior as outlined herein, the Court awards a sanction of $7,500 in favor of Starer, a sanction of $7,500 in favor of the debtor, and finally a sanction of $5,000, payable to the Clerk of this Court, all in order to deter such future litigation abuse by counsel. Merrill is granted a period of six months from the date of this Memoran-

---

**5.** The uncontradicted evidence at the sanctions hearing was that Merrill was the ghost writer of the motion for the appointment of a trustee for CDI filed by Lee Cohen early in the case. That pleading almost mirrored the language of the Motion filed by Merrill; this Court found that Cohen's motion violated Bankruptcy Rule 9011 and he was sanctioned for signing and filing the pleading in violation of Rule 9011. Cohen's improper conduct was the subject of our memorandum opinion dated February 8, 1996. It is distressing to learn that Cohen's motion was actually written by Merrill, which attempts to circumvent Bankruptcy Rule 9011 and violates the Code of Professional Responsibility.

dum Opinion and Order to pay the sanctions imposed.

It is so ORDERED.